Filed 12/6/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B269034 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA134117) |
| v. | |
| ANGEL GALLARDO et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kevin Filer, Judge. Affirmed as to defendant Angel Gallardo. Reversed as to defendants Smith Garcia and Michael Gallardo.

Neil Rosenbaum, under appointment by the Court of Appeal, for Defendant and Appellant Angel Gallardo.

Verna Wefald, under appointment by the Court of Appeal, for Defendant and Appellant Michael Gallardo.

Tracy J. Dressner, under appointment by the Court of Appeal, for Defendant and Appellant Smith Garcia.

Xavier Becerra, Attorney General; Gerald A. Engler, Chief Assistant Attorney General; Lance E. Winters, Senior Assistant Attorney General; Stacy S. Schwartz, Deputy Attorney General; and John Yang, Deputy Attorney General, for Plaintiff and Respondent.

_____

Appellants Angel Gallardo, Michael Gallardo and Smith Garcia were charged with one count of murder, two counts of attempted murder and one count of shooting at an occupied car. The prosecution alleged the appellants and a fourth co-defendant, Felipe Ramos, had jointly conducted a drive-by shooting of three rival gang members, one of whom died. The primary piece of evidence at trial was a surreptitiously-recorded jailhouse conversation between Angel Gallardo and two paid informants who were posing as inmates. During the conversation, Angel claimed that Michael drove Garcia to shoot the victims, while he waited around the corner in a second "getaway" vehicle. Co-defendant Ramos was not mentioned on the tape.

The jury convicted Smith Garcia of first degree murder, and Angel and Michael Gallardo of second degree murder. The jury also found appellants guilty of the remaining three counts. The jury could not reach a verdict with respect to Ramos.

On appeal, Garcia and Michael Gallardo argue the admission of Angel's jailhouse statement violated their Sixth Amendment rights under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*). Alternatively, they contend that portions of Angel's jailhouse statements which implicate them in the crime were improperly admitted against them as declarations against

Angel's penal interest. Angel Gallardo argues the court should have excluded the entire recording under Penal Code section 4001.1, which places limits on law enforcement's use of in-custody informants. He further contends the court erred in instructing the jury on attempted premeditated murder.

We reverse the judgments against Garcia and Michael Gallardo, concluding that certain statements Angel made to informants regarding his co-defendants' role in the shooting constituted inadmissible hearsay. We affirm the judgment as to Angel.

## FACTUAL BACKGROUND

### A. Summary of Facts Preceding Trial

#### 1. Summary of the shooting

On November 8, 2013, Antonio Flores, Raul Rodriguez and Raymond Rodriguez traveled to the Lumar Recycling Center on Alameda Avenue in Compton, California. All three men were affiliated with the "Lynwood Varrio Paragons" gang. Raul Rodriguez had several gang tattoos visible on his body, including the letters "LVP" on one arm and one leg, and the letter "P" on the right side of his neck.

At 3:09 p.m., the three men left the recycling facility in a white truck, and traveled northward on Alameda Avenue. Raul Rodriguez was driving the vehicle, Flores was in the front passenger seat and Raymond Rodriguez was seated in the back. Approximately two blocks north of the recycling facility, several bullets struck the driver side of their vehicle. Raul Rodriguez suffered gunshot wounds to his head, neck and chest, and died from his injuries. Flores was hit three times in his back, but survived his injuries; Raymond Rodriguez was not injured.

3

Immediately after the shooting, their vehicle collided with a car in front of them, and then crashed into a storefront.

Jacko Esqueda was a passenger in a truck headed north on Alameda Avenue at the time of the shooting. After hearing several gunshots, the driver stopped the truck. Esqueda saw a "silver-colored SUV" pass on the right side, and then turn right from Alameda Avenue onto El Segundo Avenue. Esqueda then felt a vehicle collide into the rear of the truck. Rachel Hilchey, who was also driving north on Alameda at the time of the shooting, heard several gunshots, and then saw a white truck crash into a storefront. Shortly after the crash, Hilchey saw a black car pass at a high rate of speed. Law enforcement found five nine-millimeter bullet casings at the scene of the shooting.

### 2. Summary of police investigation

#### a. Surveillance videos

The lead investigating officer, Los Angeles Sheriff's Department Sergeant Ken Perry, obtained surveillance video from the recycling facility that showed a gray Ford Explorer pulling into the parking area at 2:28 p.m., approximately 40 minutes before the shooting occurred. At 2:30 p.m., Felipe Ramos and Michael Gallardo were standing together inside the facility. Three minutes later, a white Ford Expedition pulled into the lot near the gray Ford Explorer. At 2:36 p.m., Raul Rodriguez, Raymond Rodriguez and Flores arrived at the facility in a smaller white SUV, which parked behind the gray Ford Explorer, and next to the white Expedition. The three men removed various items from their vehicle, walked past the Explorer and Expedition and then entered the facility. Shortly thereafter, the white Expedition left the recycling facility, and headed north on

4

Alameda Avenue. At 2:48 p.m., the cashier paid Felipe Ramos for the recyclable items he had deposited. Three minutes later, the gray Explorer left the facility, and headed north on Alameda Avenue.

At 3:07 p.m., Raymond Rodriguez received payment for his recyclable items. Two minutes later, at 3:09 p.m., the white truck Raymond, Raul and Flores had arrived in left the facility, and headed north on Alameda Avenue. Shortly after they pulled out, a gray Ford Explorer turned right onto Alameda Avenue from a cross street located south of the recycling facility, and then continued traveling north on Alameda Avenue, past the recycling facility, at a high rate of speed. The video did not capture any image of the driver or the license plate.

Sergeant Perry also obtained surveillance video from a store located on the corner of El Segundo Avenue, which intersects with Alameda Avenue two blocks north of the recycling facility, and Santa Fe Avenue, which runs parallel to Alameda Avenue, one block to the east. At 2:54 p.m., the video showed a gray Ford Explorer traveling closely behind a white Ford Expedition, heading eastward on El Segundo Avenue toward Santa Fe Avenue. Based on the videos, Sergeant Perry suspected that the gray Ford Explorer left the recycling facility with the white Expedition, and then circled back to the recycling facility, and committed the shooting.

### b. Collection of evidence implicating defendants

Sergeant Perry obtained a copy of a purchase ticket from the recycling facility reflecting Felipe Ramos's transaction on the day of the shooting. Perry directed another officer to the address Ramos had provided to the recycling facility, and instructed the officer to search for a gray Explorer. The officer traveled to the

address, and saw a gray Explorer parked near Ramos's house. The vehicle was registered to the mother of Michael Gallardo. Using a government license plate scanning system, Perry determined the same vehicle had been parked outside the home of Michael Gallardo's girlfriend on the morning of the shooting. Law enforcement also determined Angel Gallardo owned a white Expedition.

On January 23, 2014, a Long Beach police officer conducted a search of a residence where Smith Garcia, who went by the name "Happy," and Angel Gallardo were present. The officer found a nine-millimeter handgun in the backyard of the property, and recovered Garcia's cell phone from a vehicle parked at the house. Subsequent ballistics testing showed the handgun was the same weapon that had fired the bullet casings found at the scene of the shooting.

Law enforcement downloaded data from Garcia's cell phone, which showed he had made numerous calls to numbers associated with Michael Gallardo and Angel Gallardo.[1] The data also showed that in the days after the shooting, Garcia's phone had been used to conduct several searches on YouTube referencing "Compton shooting," "Compton car to car shooting" and "Compton shooting 11-8-13."

Law enforcement also obtained data from cell phone numbers associated with Angel, Michael and Ramos. The data showed that between 2:24 p.m. and 3:30 p.m. on the day of the shooting, all of the phones had placed calls that were received on cell phone towers in the area of the shooting. Between 2:36 p.m.

---

[1] Because defendants Angel Gallardo and Michael Gallardo share the last name, for purposes of simplicity, we hereafter refer to them each by his first name.

and 2:44 p.m., Michael and Ramos had exchanged a series of text messages, and between 2:47 p.m. and 2:50 p.m., Michael and Angel had exchanged multiple calls. Ramos's phone was also found to contain photographs of Angel and Michael; Garcia's phone contained pictures of himself, Angel and others throwing gang signs. Facebook data found on Angel's phone contained chats asserting he was with "Happy."

### 3. Statements from Angel and Felipe Ramos

#### a. Angel's jailhouse conversation

On May 21, 2014, Angel was being held in a county jail on charges unrelated to the shooting.[2] Sergeant Perry arranged to have two informants, both former members of the "Sureno" gang, placed in the cell with Angel to elicit information about the shooting. Perry provided the informants with details about the investigation so that they would be familiar with some of the names they might hear Angel use, and "know when they might be on the right track." Each informant was wearing a recording device, and was paid for their services.

After being placed in the cell, the informants initially talked to each other about their respective charges. They then asked Angel where he was from. Angel responded that he was from "Compton Largo," and went by "Sneaks." The informants asked "Where's Happy at?," to which Angel responded: "Happy, that's my cousin."

Angel was then removed from the cell, and interrogated by police about the shooting. After being brought back into the cell,

---

[2] Angel was not arrested in relation to the shooting until July of 2014.

7

the informants asked Angel what the officers had said to him, and whether they had added a charge. Angel stated that "the fool wants me to drop down what happened," and complained that "somebody's been snitching on me. Somebody's trying to say I'm the shooter and shit." When asked what evidence the police had, Angel stated "they got the gun," which he identified as a "nine glock." Angel also told the informants the police interrogator had claimed Angel and Happy's fingerprints were found on the weapon. An informant then asked Angel if he "knew what happened," to which Angel responded "yeah." The informant then asked "who was that on?," and Angel responded "the Paragons."

Angel also told the informants the police interrogator had claimed officers overheard cell phone conversations between Angel and Garcia at the time of the shooting. At that point, one of the informants interjected: "So you're telling me you were driving and Happy was the shooter?" Angel responded "yeah." The other informant then asked whether Happy had shot from the car Angel was driving, to which Angel again responded "yeah," and described the car as a "gray Ford Explorer." Angel then renewed his complaints that someone was "snitching" on him, and "trying to pin it on me."

The informants asked Angel whether he had told anyone what happened. Angel said some people "knew" because "that fool, Happy, was telling people," and again complained that somebody "from the hood [wa]s trying to pin it on me." In response, the informant asked "But who . . . is the actual shooter though?" Angel stated "My cousin." An informant then told Angel "I'm pretty sure you can fight it," and inquired whether the police had "the car." After Angel acknowledged "they got the

8

car," an informant asked what time and street the shooting had happened on. Angel explained that the incident occurred around "3:00 or 4:00 p.m.," and that "they" had been driving on Alameda, and then went right onto El Segundo.

When an informant asked why they kept the gun, Angel said that "Happy fucking . . . . They wanted to keep it as a trophy." The informant stated that although the gun would "hurt [Angel]," the fact that the weapon was not "under your guys pad" was a "good thing," further stating "I don't think they got shit on you, fool."

The informants then resumed questioning Angel about the specifics of the shooting, inquiring whether they "caught some fool slipping," or whether they had "stopped somewhere." Angel explained that they "just got the fool" at the "recycling center." Angel further explained that they had arrived at the recycling facility in a "white Expedition," and then left to do the "jale" in the gray car. Contrary to his earlier statement, Angel claimed he was driving the white vehicle, and "Happy was driving the gray one. And he got off and shot him. . . . I was waiting for them. He got in that Expedition and we took off."

The informants asked Angel how they had known where the "guys" were from, and he responded "because they had it tattooed right here." Angel then complained again that "somebody" was accusing him of the being the shooter, and was "trying to pin it on [him]." The informants told Angel he "shouldn't trip" because the police did not have "shit" on him. An informant then suggested that the person who was snitching must be the person who was driving the gray car, and asked who that person was. Angel said "the homey Mike." Angel then provided a third version of what had occurred, claiming that

9

"Mike" was driving the gray vehicle with Garcia, and that Angel had been "waiting around the corner for them fools." The informant then asked: "Mike drove Happy and did the shooting?" Angel said "yeah," and confirmed he was "just the getaway driver." An informant stated that "Mike" must be the snitch, because he was the only other person who "knew the details."

An informant then summarized his understanding of the facts: "Happy and Mike took off. . . . Happy shoots him. They – shoot him. . . . Mike . . . drops off Happy. So he – you're not – all you are is fucking – you didn't do anything there." Angel responded "Yeah." The informants then responded that "he should be good," which led to the following exchange:

INFORMANT: One thing that's wrong [with the detective's story] is that you're not the shooter.
ANGEL: I'm not the shooter.
INFORMANT: You're the getaway driver.
ANGEL: I'm the getaway driver.

### b. Interrogation of Felipe Ramos

On July 9, 2014, the police interviewed Felipe Ramos, who admitted he had arrived at the recycling facility on the day of the shooting in the gray Ford Explorer shown in the surveillance video. He also admitted he had left the recycling facility in that vehicle, and then followed a white Expedition. According to Ramos, the white Expedition had traveled north on Alameda Avenue, then turned right onto El Segundo Avenue, and right onto Santa Fe Avenue, where the car "waited." The Explorer, however, drove back past the recycling facility. Ramos said he

heard gunshots, and saw a car hit the back of another car. Ramos then turned right onto El Segundo Avenue.

### 4. The information

The District Attorney for the County of Los Angeles filed an information charging Angel, Michael, Garcia and Ramos with one count of murder (Pen. Code, § 187, subd. (a)[3]), two counts of attempted murder (§§ 664, 187, subd. (a)) and one count of shooting at an occupied vehicle (§ 246). The information contained special allegations asserting the attempted murders had been willful, deliberate and premeditated (see § 664, subd. (a)), and numerous firearm allegations asserting Garcia had personally and intentionally discharged a firearm in the commission of each offense, and that a principal had discharged a firearm in the commission of each offense. (See § 12022.53, subds. (a)-(e).) The information also alleged each defendant had committed all four counts for the benefit of a criminal street gang. (See § 186.22.)[4]

## B. Trial Court Proceedings

### 1. The admission of Angel's jailhouse conversation

Prior to trial, counsel for Garcia and Michael objected to the admission of Angel's jailhouse conversation on Sixth

---

[3]  Unless otherwise noted, all further statutory citations are to the Penal Code.

[4]  The information included additional special allegations asserting each defendant had suffered one or more prior prison term felonies (see § 667.5, subd. (b)), and was ineligible for parole. (§ 1203, subd. (e).)

11

Amendment grounds, asserting that under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), his statements were "testimonial" in nature because they had been elicited by paid informants for the express purpose of aiding in the investigation. Alternatively, counsel argued that numerous statements Angel had made during the conversation, including those in which he identified Garcia as the shooter and Michael as the driver, did not qualify as declarations against Angel's interest, and therefore constituted inadmissible hearsay. According to counsel, Angel's statements effectively minimized his own role in the offense, and shifted blame toward Garcia and Michael. Defense counsel also argued that under *People v. Duarte* (2000) 24 Cal.4th 603 (*Duarte*), the court could not admit the entire conversation based solely on the fact that it contained some statements that were against Angel's interest, but rather was required to independently assess whether each statement within the transcript was against his interest.

Counsel also argued Angel's statements lacked "trustworthiness" because he had provided three different versions of his story, initially claiming he was the driver of the vehicle Garcia had fired from, then claiming Garcia was the driver and the shooter, and finally asserting Michael had driven while Garcia fired, and that Angel had waited around the corner in a different vehicle. Michael's counsel argued Angel's statements regarding his client were particularly unreliable because they were made only after informants had suggested Michael was the snitch.

Angel's counsel also objected to portions of the transcript on hearsay grounds, noting that many of his statements appeared to recount information he had been told by other people. Counsel

12

also asserted the transcript contained numerous narratives and hypothetical questions the informants had posed to Angel, which did not qualify as admissible evidence.

The prosecution argued that Angel's statements were not "testimonial" within the meaning of *Crawford* because there was no evidence that Angel knew he was speaking to informants, or that the answers he was providing might be used against him at trial. The prosecution also argued that all of Angel's statements qualified as declarations against his interest because he was "admitting he is part of a conspiracy to kill people and admitting at the very least to helping get away."

The court admitted Angel's jailhouse conversation in its entirety against all of the defendants under the declaration against penal interest exception.[5] The court explained there was "sufficient indicia of reliability [to allow all of Angel's] statements." In support, the court noted that Angel had provided a substantial amount of detail regarding the shooting, including the identity of the shooter, the route the assailants had taken during the commission of the offense and specific information about the victims. The court also concluded the Sixth Amendment was inapplicable, noting that numerous prior cases had found statements made to undercover informants were not "testimonial" within the meaning of *Crawford*.

---

[5]     The hearing transcript indicates the trial court did exclude other conversations Angel had with the informants discussing his relationship with various Largo gang members who were not involved in the shootings. The court excluded these statements under Evidence Code section 352.

## 2. *Witness testimony*

At trial, Raymond Rodriguez testified that he had traveled to the recycling facility with Flores and Raul on the day of the shooting. Raymond said they did not get into any verbal or physical altercations while at the facility. Raymond admitted he and Flores were members of the Paragons gang, and that Largo was a rival gang. He denied, however, making any reference to his gang while at the facility. Shortly after leaving the facility, the car he was traveling in with Flores and Raul was fired upon. Raymond did not see where the shots came from.[6]

Several witnesses who were driving on Alameda Avenue at the time of the shooting, including Jacko Esqueda and Rachel Hilchey, testified that they had heard gunshots while driving on Alameda Avenue, and had then seen a silver or black colored vehicle drive by them. Only one witness, David Hilchey, who had been driving a semi-truck in front of his wife Rachel at the time of the shootings, testified that he had actually seen the shooting. David claimed he had seen two shooters of "Mexican heritage" leaning out of a silver car firing multiple weapons while looking "happy." He did not, however, identify any of the defendants as the shooters. Hilchey's claim that he had seen the shooting directly conflicted with statements he had made to officers immediately after the incident, and at the preliminary hearing. When asked at trial to clarify these discrepancies, Hilchey stated that, at the time of the shooting, he had been awake for 22 hours, which affected his memory. Hilchey also testified he was taking

---

[6] Flores provided similar testimony, but denied membership in any gang, and denied any knowledge regarding Raul or Raymond's status as gang members.

14

"hydrocodeine about every four hours" to treat "gunshot wounds" suffered in Vietnam.

Sergeant Perry testified about his role in the investigation, including his use of the paid informants to gather information from Angel. The prosecution played the jury a recording of the jailhouse conversations, and provided it with a transcript. The jury also heard the police interview of Felipe Ramos, but was instructed that it could only consider such statements against Ramos, and not against any of the other defendants.

Several other law enforcement agents and personnel who participated in the investigation also testified, including multiple officers who had aided Perry in gathering evidence, a ballistics expert who had tested the firearm found at the residence where Garcia and Angel were located, the medical examiner who had reviewed Raul's autopsy results and a criminalist who had created a computer-generated "cell tower video" based on the cell phone data law enforcement had retrieved from the defendants' phones. The video purported to show that all four defendants were in the area of the recycling facility at the time the shootings occurred.

The prosecutor also called detective Marc Boisvert to testify as a gang expert. Boisvert stated that the recycling facility fell within the territory of the Compton Varrio Largo gang, which was a rival of the Lynwood Varrio Paragons. Based on various tattoos, photos and self-admissions, Boisvert identified Angel, Michael and Garcia as members of the Largo gang, and the three victims of the shootings as members of the Paragons gang. When presented with a hypothetical scenario reflecting the evidence in the case (almost all of which was based on Angel's jailhouse statements), Boisvert opined that the crimes had been

committed for the benefit of, in association with and at the direction of a criminal street gang.

Michael also called a gang expert, Martin Flores, who had listened to the recording of Angel's jailhouse statements. Flores testified that based on other cases he had worked on, he recognized the paid informants as two former high ranking members of the Mexican Mafia who now routinely served as paid agents for law enforcement. Flores also asserted that although no threats could be heard on the transcript, the informants may have attempted to force Angel into confessing through non-verbal visual threats.

### 3. Jury verdicts

The jury found Angel and Michael guilty of second degree murder, two counts of attempted murder and one count of shooting at an occupied vehicle. The jury further found that the attempted murders had been premeditated, and that all the crimes had been committed for the benefit of a street gang. The jury rejected, however, special allegations asserting a principal had personally and intentionally discharged a firearm in the commission of each offense.[7]

The jury found Garcia guilty of first degree murder, two counts of attempted murder and one count of shooting at an occupied vehicle. The jury found both attempted murders had

---

[7] Angel and Michael Gallardo received identical sentences of 15 years to life in prison on count one, plus a one-year enhancement for their respective prior prison term felonies under section 667.5, subdivision (b). They received 15 years to life in prison on counts two and three, and 15 years in prison on count four, all of which were to be served concurrently to their sentences on count one.

been premeditated, that Garcia had personally and intentionally discharged a firearm in the commission of each offense, resulting in great bodily injury, and that he had committed each crime for the benefit of a street gang.[8]

The jury was unable to reach a verdict with respect to defendant Felipe Ramos, and the trial court declared a mistrial in his case.

## DISCUSSION

### A. *The Admission of Angel's Jailhouse Conversation Did Not Violate his Co-Defendants' Sixth Amendment Right to Confrontation*

Garcia and Michael argue that the admission of Angel's statements to jailhouse informants violated their Sixth Amendment right to confrontation under both *Crawford, supra,* 541 U.S. 36, and *Bruton, supra*, 391 U.S. 123.

---

[8] The court sentenced Garcia to 50 years to life in prison on count one, which consisted of a base offense of 25 years to life, plus an additional 25 years for the firearm enhancement under section 12022.53, subdivision (d). On counts two and three, the court sentenced Garcia to terms of 40 years to life in prison, consisting of a base offense of 15 years to life in prison, plus an additional 25 years under section 12022.53, subdivision (d). The court imposed a sentence of 40 years on count four, which it stayed pursuant to section 654. The court further ruled that the sentences in counts one through three were to be served consecutively, plus two additional years for two prior prison felonies under section 667.5, subdivision (b), for a total term of 132 years to life in prison.

### 1. *Angel's statements were not testimonial within the meaning of* <u>*Crawford*</u>

#### a. *Summary of relevant law*

"The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford, supra,* 541 U.S. at p. 42.)  In *Ohio v. Roberts* (1980) 448 U.S. 56 (*Roberts*), the United States Supreme Court held that "the hearsay statement of a declarant not present for cross-examination at trial was admissible under the confrontation clause only if (1) the declarant was truly unavailable to testify and (2) the statement bore adequate indicia of reliability.  Under this test, 'reliability [could] be inferred without more in a case where the evidence [fell] within a firmly rooted hearsay exception." (*People v. Cage* (2007) 40 Cal.4th 965, 975 (*Cage*).)

In *Crawford, supra,* 541 U.S. 36, however, the Court "announced a new standard for determining when the confrontation clause of the Sixth Amendment prohibits the use of hearsay evidence." (*Cage*, *supra*, 40 Cal.4th at p. 969.)  The Court conducted a "historical analysis to ascertain the common understanding of the scope of the right to confront witnesses," and concluded that "the clause's express reference to 'witnesses' reflects its focus on those who "'bear testimony,'" which typically is "'[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'"  [Citation.]  'An accuser who makes a formal statement to government officers,' said the [C]ourt, 'bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.'  [Citation.]" (*Id.* at pp. 977-978.)

18

Applying this historical definition of the term "witnesses," *Crawford* "held that the admission of 'testimonial' out-of-court statements violates a criminal defendant's confrontation rights unless the declarant is unavailable to testify and the defendant had a prior opportunity for cross-examination [citation], or waived that right by his own wrongdoing [citation]." (*People v. Leon* (2015) 61 Cal.4th 569, 602-603 (*Leon*).)  The Court further held that the admission of "nontestimonial" statements "is the concern of state and federal rules of evidence, not the Confrontation Clause." (*Michigan v. Bryant* (2011) 562 U.S. 344, 359 (*Bryant*); see also *Crawford, supra*, 541 U.S. at p. 68.)

Although *Crawford* and its progeny have "not settled on a clear definition of what makes a statement testimonial, [our state Supreme Court has] discerned two requirements.  First, 'the out-of-court statement must have been made with some degree of formality or solemnity.' [Citation].  Second, the primary purpose of the statement must 'pertain [] in some fashion to a criminal prosecution.' [Citation.]" (*Lopez, supra,* 55 Cal.4th at p. 581.)  Thus, "the statement must have been given and taken primarily for the purpose ascribed to testimony – to establish or prove some past fact for possible use in a criminal trial. . . . [T]he primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation." (*Cage, supra*, 40 Cal.4th at p. 984.)

### b. *Angel's jailhouse statements were nontestimonial*

Michael and Garcia contend Angel's jailhouse statements were "testimonial in nature" because the questions the informants asked him were specifically designed "to establish past facts to prove in a criminal prosecution."  The Attorney

19

General, however, argues that Angel's statements were nontestimonial because the circumstances under which the statements were given indicate he did not know he was speaking with police informants, or that his statements would possibly be used at trial.

In *People v Arauz* (2012) 210 Cal.App.4th 1394 (*Arauz*), Division Six of this District concluded that statements given under essentially identical circumstances were nontestimonial, and therefore not subject to the confrontation clause. The defendants in *Arauz* were charged with two counts of attempted murder in connection with a gang-related, drive-by shooting. During the pendency of the investigation, the defendants' suspected accomplice, Jose Velasquez, was arrested for an unrelated drug offense, and placed in a cell next to a paid informant. The informant claimed he was a member of the "Mexican Mafia," and asked Velasquez about the shootings. (*Id*. at p. 1399.) In response, Velasquez told the informant he had driven the defendants to the area where the shooting occurred, and that the defendants then shot the victims.

On appeal, defendants argued the admission of Velasquez's jailhouse statements violated their Sixth Amendment right of confrontation, contending that the informant had been "'prepped' by the police and conducted a de facto interrogation." (*Arauz, supra,* 210 Cal.App.4th at p. 1402.) The court, however, concluded the statements were nontestimonial because, regardless of the informant's intent in asking the questions, there was no evidence Velasquez knew or suspected that the informant was a government agent, or that his comments might be used at trial. (*Ibid*.) In support of its holding, *Arauz* cited dicta from a parenthetical citation in *Davis v. Washington* (2006) 547 U.S. 813

20

(*Davis*) indicating that "'statements made unwittingly to a Government informant'" are "nontestimonial." (*Arauz, supra,* 210 Cal.App.4th at p. 1402 [citing and quoting *Davis, supra,* 547 U.S. at p. 825].) *Arauz* is in accord with numerous federal court decisions that have found statements made to informants under analogous circumstances to be nontestimonial. (See *U.S. v. Dale* (8th Cir. 2010) 614 F.3d 942, 956; *U.S. v. Udeozo*r (4th Cir. 2008) 515 F.3d 260, 269-270; *U.S. v. Watson* (7th Cir. 2008) 525 F.3d 583, 589; *U.S. v. Underwood* (11th Cir. 2006) 446 F.3d 1340, 1347-1348; *U.S. v. Hendricks* (3d Cir. 2005) 395 F.3d 173, 182-184; *U.S. v. Saget* (2d Cir. 2004) 377 F.3d 223, 229-230].)

We agree with the reasoning of these authorities. As clarified by our Supreme Court, to be "testimonial" under *Crawford*, the statement must have been "given *and* taken primarily for the purpose [of] . . . establish[ing] or prov[ing] some past fact for possible use in a criminal trial." (*Cage, supra*, 40 Cal.4th at p. 984 [emphasis added].) Although the declarant and the interrogator's perspectives are both relevant to determining the "primary purpose" of the statement (*Bryant, supra*, 562 U.S. at p. 367 & fn. 11 [*Crawford* "requires a combined inquiry that accounts for both the declarant and the interrogator"]), it is "'in the final analysis the declarant's statements, not the interrogator's questions, that the Confrontation Clause requires us to evaluate.' [Citation.]" (*Id.* at p. 367, fn. 11.) The Sixth Amendment applies when the statement, rather than the question that elicited it, was made "with some degree of formality or solemnity." (*Lopez, supra,* 55 Cal.4th at p. 581 ["the out-of-court statement must have been made with some degree of formality or solemnity"].)

21

In this case, there is no evidence indicating Angel knew he was speaking to police informants, or otherwise anticipated his statements would "be used prosecutorially." (*Crawford*, *supra*, 541 U.S. at p. 51.) Accordingly, his statements were nontestimonial, and do not implicate the Sixth Amendment right to confrontation.[9]

### c. *Bruton* does not apply to nontestimonial statements

Michael and Garcia also argue that even if Angel's jailhouse statements were nontestimonial within the meaning of *Crawford*, the admission of such statements nonetheless violated their Sixth Amendment right to confrontation under *Bruton, supra,* 391 U.S. 123 and *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*). Broadly stated, the *Aranda/Bruton* rule declares that a defendant is deprived of his or her Sixth Amendment right to

---

[9]     In their appellate briefs, Michael and Garcia appear to argue that the record does contain some evidence suggesting that Angel knew his statements to the informants might be used against him at a future trial. In support, they cite a portion of the record indicating that while previously being held on an unrelated charge, Angel and Garcia had covered their heads with a blanket while speaking to each other, suggesting they knew that their conversation was being recorded. We do not agree that Angel's behavior while being held in a different facility, at a different time, with a different person is sufficient to show he suspected the informants in this case were gathering information against him, or that their conversation was being recorded. The fact that Angel made a series of highly incriminating remarks to the informants, essentially admitting his complicity in the shootings, provides persuasive evidence that he did not know his statements might be used at trial.

22

confront witnesses when a facially incriminating statement of a nontestifying co-defendant is introduced at their joint trial, even if the jury is instructed to consider the statement only against the declarant.  (See *People v. Anderson* (1987) 43 Cal.3d 1104, 1121.)  Under those circumstances, the trial court must grant separate trials, exclude the statement or excise all references to the nondeclarant defendant.  (*Aranda*, *supra*, 63 Cal.2d at pp. 530–531; see also *People v. Mitcham* (1992) 1 Cal.4th 1027, 1045.)

*Bruton* and *Aranda*, however, predate *Crawford*, which narrowed the scope of the right to confrontation to testimonial statements.  (See *Cage, supra,* 40 Cal.4th at p. 981 [under *Crawford* "the confrontation clause is concerned solely with hearsay statements that are testimonial"].)  The Attorney General argues that by narrowing the right of confrontation generally, *Crawford* necessarily limited the rule of *Bruton* to incriminating statements of a nontestifying co-defendant that are testimonial in nature.  Defendants, however, assert that "notwithstanding what *Crawford* said about testimonial hearsay, the United States Supreme Court has never explicitly overruled . . . *Bruton* or [its] progeny and [it] remains good law."

Our Supreme Court's recent decision in *People v. Cortez* (2016) 63 Cal.4th 101 (*Cortez*) resolves this previously unsettled issue.  The defendant in *Cortez* argued that the admission of an accomplice's incriminating out-of-court statements violated her Sixth Amendment right to confrontation under *Bruton*.  The Court rejected the argument, explaining:  "The [United States] Supreme Court has unequivocally held 'that the confrontation clause applies only to testimonial hearsay statements and not to [hearsay] statements that are nontestimonial.'  [Citation.]  [The accomplice's] statements to [the third-party] were unquestionably

23

nontestimonial. . . . Thus, binding high court precedent requires us to hold that the Sixth Amendment is inapplicable and that defendant's confrontation clause claim therefore fails." (*Cortez, supra*, 63 Cal.4th at p. 129.)[10]

As discussed above, Angel's statements to the informants were nontestimonial in nature. Under our high court's holding in *Cortez*, this determination necessarily forecloses any claim under *Bruton*.[11]

---

[10] Other published California decisions that have addressed *Crawford's* effect on *Bruton*, which were decided either before *Cortez* or do not specifically reference its holding, reached the same conclusion. (*People v. Washington* (2017) 15 Cal.App.5th 19, 28 [*Crawford* "narrow[ed] the reach of . . . the [] *Bruton* doctrine" to testimonial statements]; *People v. Arceo* (2011) 195 Cal.App.4th 556, 575 (*Arceo*).) Numerous federal circuit court decisions are in accord. (See *U.S. v. Vasquez* (5th Cir. 2014) 766 F.3d 373, 378-379 ["Many circuit courts have held that *Bruton* applies only to statements by co-defendants that are testimonial under *Crawford*"]; *U.S. v. Dargan* (4th Cir. 2013) 738 F.3d 643, 650-651; *U.S. v. Clark* (10th Cir. 2013) 717 F.3d 790, 815-816; *U.S. v. Berrios* (3d Cir. 2012) 676 F.3d 118 128-129; *Dale, supra*, 614 F.3d at pp. 958-959; *U.S. v. Figueroa-Cartagena* (1st Cir. 2010) 612 F.3d 69, 85; *U.S. v. Johnson* (6th Cir. 2009) 581 F.3d 320, 326; *U.S. v. Williams* (2d Cir. 2007) 506 F.3d 151, 156.)

[11] A section of Michael's appellate brief addressing the declaration against interest exception includes a sentence asserting that he was denied "due process by the admission of Angel's tape-recorded statements." Michael's brief, however, does not provide any legal argument in support of his conclusory assertion that the admission of Angel's statements violated his right to due process. We therefore deem his due process claim waived. (See *Silva v. See's Candy Shops, Inc.* (2016) 7 Cal.App.5th 235, 250 ["a conclusory statement is insufficient to

24

### B. The Trial Court Committed Prejudicial Error When It Admitted Angel's Statements Identifying Garcia as the Shooter and Michael as the Driver Under the Declaration Against Interest Exception

Michael and Garcia argue that even if the admission of Angel's jailhouse confession did not violate their Sixth Amendment right to confrontation, numerous statements Angel made to the informants regarding their role in the shooting, including his assertions that Garcia was the shooter and that Michael drove the car Garcia fired from, should have been excluded on hearsay grounds. Michael and Garcia argue that because these statements effectively served only to minimize Angel's role in the shooting, and shift blame to his co-defendants, they did not qualify as declarations against his interest. (See Evid. Code, § 1230.)

#### 1. Summary of relevant law

"[He]arsay statements are generally inadmissible under California law[.]" (*People v. Grimes* (2016) 1 Cal.5th 698, 710-711 (*Grimes*).) "'The chief reasons for this general rule of inadmissibility are that the statements are not made under oath, the adverse party has no opportunity to cross-examine the

---

challenge a court's evidentiary ruling"]; *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument . . . we treat the point as waived"]; *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 287 ["we may disregard conclusory arguments that are not supported by pertinent legal authority or fail to disclose the reasoning by which the appellant reached the conclusions he wants us to adopt"].)

declarant, and the jury cannot observe the declarant's demeanor while making the statements.' [Citation.]" (*Duarte, supra*, 24 Cal.4th at p. 610.) "[T]he rule[, however,] has a number of exceptions." (*Grimes, supra*, 1 Cal.5th at p. 710.) One such exception, set forth in Evidence Code section 1230, permits the admission of any statement that "when made, . . . so far subjected [the declarant] to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." "[T]he rationale underlying [this] exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*Grimes, supra*, 1 Cal.5th at p. 711.)

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.]" (*Grimes, supra*, 1 Cal.5th at p. 711.)

Regarding the second requirement, our Supreme Court has admonished that "[o]nly statements that are specifically disserving to the hearsay declarant's penal interests are admissible as statements against penal interests. [Citation.]" (*People v. Vasquez* (2012) 205 Cal.App.4th 609, 621 [citing *Duarte, supra*, 24 Cal.4th at p. 612 [exception "'inapplicable to evidence of any statement or portion of a statement not itself specifically disserving to the interests of the declarant'"]; see also *People v. Leach* (1975) 15 Cal.3d 419, 441.) Section 1230 does not

authorize the admission of "those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others." (*Grimes, supra*, 1 Cal.5th at p. 715.) Nor "does [it] not allow admission of non-self-inculpatory statements . . . made within a broader narrative that is generally self-inculpatory." (*Williamson v. U.S.* (1994) 512 U.S. 594*,* 600-601; see *Grimes, supra*, 1 Cal.5th at p. 715 [citing with approval *Williamson's* interpretation of the "analogous exception to the federal hearsay rule"].)

"That a hearsay statement may be facially inculpatory or neutral cannot always be relied upon to indicate whether it is 'truly self-inculpatory, rather than merely [an] attempt [ ] to shift blame or curry favor.' [Citation.] Even a hearsay statement that is facially inculpatory of the declarant may, when considered in context, also be exculpatory or have a net exculpatory effect." (*Duarte*, *supra*, 24 Cal.4th at pp. 611-612.) A "statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) . . . is . . . inadmissible.' [Citation.]" (*Id.* at p. 612.) Thus, "'an approach which would find a declarant's statement wholly credible *solely* because it incorporates an admission of criminal culpability is inadequate.' [Citation.]" (*Id.* at p. 611.)

"This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335.) Our Supreme Court recently explained, for example, that the exception permits the "admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a

27

specific statement against penal interest.' [Citation.]" (*Grimes, supra*, 1 Cal.5th at p. 716.)

"Whether a statement is self-inculpatory or not can only be determined by viewing the statement in context." (*Grimes, supra*, 1 Cal.5th at p. 716.) "[T]he court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.]" (*Id.* at p. 711.) "Ultimately, courts must consider each statement in context in order to answer the ultimate question under Evidence Code section 1230: Whether the statement, even if not independently inculpatory of the declarant, is nevertheless against the declarant's interest, such that 'a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true.' . . . . [S]uch a statement is more likely to satisfy the against-interest exception when the declarant accepts responsibility and denies or diminishes others' responsibility, as in the example "'I robbed the store alone,'" as opposed to attempting to assign greater blame to others, as in the example, "'I did it, but X is guiltier than I am.'" [Citation.]" (*Id.* at p. 716.)

"We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion. [Citation.]." (*Grimes, supra*, 1 Cal.5th at pp. 711-712.)

> 2. *The trial court erred in admitting Angel's statements identifying Garcia as the shooter and Michael as the driver*

There is no dispute that Angel was not available to testify as a witness because he had exercised his Fifth Amendment right

28

not to incriminate himself.  (See *Duarte*, *supra*, 24 Cal.4th at p. 609 ["Having invoked his Fifth Amendment right not to incriminate himself, [the co-defendant] was, for hearsay rule purposes, not available as a witness"].)  Michael and Garcia argue, however, that the prosecution failed to establish numerous statements Angel made to the informants regarding his co-defendants' role in the shootings were "against [his] penal interest when made."  (*Grimes*, *supra*, 1 Cal.5th at p. 711.)

When ruling on the admissibility of Angel's jailhouse confession, the trial court did not independently assess whether each statement implicating Garcia and Michael was in fact against Angel's penal interest at the time he made it.  Instead, the trial court elected to admit the entire 40-page transcript because it found certain details Angel had provided to the informants regarding the crime (including his identification of Garcia as the shooter, his description of the vehicles used and the route they drove) showed his entire statement was sufficiently trustworthy to warrant its inclusion as a declaration against interest.  The court's implied conclusion—in effect a decision that every statement Angel made implicating his co-defendants was sufficiently against his penal interest—cannot withstand scrutiny even under the deferential abuse of discretion standard.

Although Michael and Garcia's appellate brief challenge a wide array of statements that implicate them in the shootings, we limit our analysis to two categories of statements that appear in the 40-page transcript:  Angel's affirmative responses to the informants' inquiries regarding whether Garcia was the shooter, and Angel's identification of Michael as the driver of the vehicle from which the shots were fired.  To properly assess whether these two categories of statement were against Angel's penal

29

interest, we must first review the circumstances under which the statements were made, and the actual content of the remarks.

As explained in more detail in the factual summary above, shortly after police interrogators had questioned Angel about the shootings, law enforcement placed him in a cell with two paid informants who had been briefed on the investigation, and instructed to elicit incriminating information. The informants initiated conversation with Angel by asking where he was from, and what the investigating officers had told him about his charges. Angel immediately expressed frustration that somebody had been "snitching," and was "trying to say I'm the shooter." He made numerous similar remarks throughout the conversation, repeatedly asserting that law enforcement and a "snitch" were trying to "pin" the entire crime on him.

The informants were the first party to bring up Garcia, asking Angel, "Who is Happy?," and were also the first party to raise the possibility that Garcia was the shooter. Specifically, after Angel told the informants the police had found the weapon used to commit the offense, one of the informants asked: "So you're telling me you were driving and Happy was the shooter?" Angel responded "yeah." The second informant then asked if Angel was driving the car Garcia had fired from, to which Angel again responded "yeah," and described the car as a gray Explorer. When Angel again complained that someone was trying to pin the crime on him, the informants immediately asked "But who . . . was the actual shooter?", to which Angel responded "my cousin."

As the informants continued asking questions, Angel provided details that appeared to conflict with his initial statements. Angel said "they" had arrived at the recycling facility in two cars, a white Expedition and a gray Explorer.

Angel then claimed that when they left the recycling facility to do the "jale" (an apparent reference to the shooting), Garcia drove the gray Explorer and "got off and shot him," while Angel waited in the white Expedition.

Angel did not make any reference to Michael until after one of the informants indicated the "snitch" had to be someone else who participated in the crime other than Garcia. When Angel expressed further frustration that someone was trying to pin the crime on him, an informant indicated the snitch must have been the person who was driving the gray car, and asked Angel to identify that person. In response, Angel stated "the homey Mike" drove Garcia in the gray car, while Angel "wait[ed] around the corner" in the "getaway" car. An informant then narrated his understanding of what had occurred, stating that "Happy and Mike" had committed the shooting, then Mike dropped Happy off at Angel's vehicle, adding: "you didn't do anything there." Angel responded "Yeah," and affirmatively stated, "I'm not the shooter," "I'm the getaway driver."

Considering the content of the statements and the context in which they were made, we conclude Angel's assertions that Garcia was the shooter, and that Michael drove the car involved in the shooting, were too "'self-serving and unreliable'" (*Duarte*, *supra*, 24 Cal.4th 611) to qualify as declarations against his penal interest. Although these statements did effectively "admit[] some complicity" (*id*. at p. 612) by demonstrating Angel had knowledge of what had occurred (a characteristic common to most accomplice statements implicating a co-defendant), the statements nonetheless "plac[ed] the major responsibility" on his co-defendants. (*Ibid*.) These are the exact type of statements our Supreme Court has instructed to view with caution when

31

assessing the applicability of the against interest exception. (*Ibid.*; *Grimes*, *supra*, 1 Cal.5th at p. 716 ["a statement is more likely to satisfy the against-interest exception when the declarant accepts responsibility . . . as opposed to attempting to assign greater blame to others, as in the example, '"I did it, but X is guiltier than I am."'"].)

Moreover, at the time Angel identified Garcia as the shooter and Michael as the driver, he had already made a series of highly incriminating statements to the informants that essentially acknowledged his participation in the crime: He had identified himself as a member of the Largo gang; he had revealed the police found the gun used to commit the crime; he had described the make and model of the weapon; he had admitted he "knew what happened"; and he had identified the victims as "Paragons." In light of those prior admissions, identifying Garcia as the shooter and Michael as the driver of the vehicle from which the shots were fired did little to increase Angel's criminal culpability, and served primarily to "minimize [his] role and place the blame . . . on [his] accomplice[s]." (*People v. Smith* (2017) 12 Cal.App.5th 766, 805, fn. 4.)

Numerous factors regarding the circumstances under which the statements were made also raise questions about their reliability. First, at the outset of his discussion with the informants, Angel complained that law enforcement and a "snitch" were trying to pin all of the blame for the offenses on him, a sentiment he repeated throughout the conversation. It may be reasonably inferred from these statements that Angel's subsequent descriptions of his co-defendants' role in the crimes were intended, at least in part, to mitigate his own blameworthiness.

Second, Angel provided conflicting descriptions of his and his co-defendants' respective role in the offense, initially claiming that he drove the vehicle that Garcia had fired from, then claiming that Garcia was the driver and the shooter, and finally claiming that Michael drove Garcia to conduct the shooting while he waited around the corner in a second vehicle.

Third, all of Angel's statements identifying Garcia as the shooter and Michael as the driver were proceeded by leading questions or narrative statements by the informants. As noted above, Angel first identified Garcia as the shooter when an informant abruptly asked, "So you are telling me Happy was the shooter and you were the driver," to which he simply said "yeah." He only identified Michael as the driver after the informant indicated the driver of the gray Explorer had to be the snitch, and then asked Garcia to clarify who was driving that vehicle. Each time Angel identified Garcia as the shooter or Michael as the driver, it was at the specific prompting of the informants.

This is not a case where, without ever attempting to shift blame, the declarant merely implicated a co-defendant while discussing the details of a crime with a friend or family member. (Compare *Cortez*, *supra*, 63 Cal.4th at p. 128 [statements regarding defendant's role in the offense admissible where declarant "'consistently assigned the most blame to himself[,] . . . never attempted to shift blame to [defendant]'" and had made the statements to close family members in the family home]; *Arceo*, *supra*, 195 Cal.App.4th at p. 577 [declarant's statement that he shot one victim, and was about to shoot the second victim, when the defendant requested that he be permitted to do so, admissible because the statement did not "remotely . . . ' . . . shift or spread the blame' to another," and was made during a ""conversation . . .

between friends in a noncoercive setting that foster[ed] uninhibited disclosure"""].) Nor is this a case where the declarant implicated the defendant while "candid[ly]" "bragging" about his own role in the offense. (Compare *Arauz, supra*, 210 Cal.App.4th at pp. 1400-1401 [statement admissible where declarant had "bragged" to jailhouse informant that he had driven two co-defendants to shoot the victims, had been "candid about his role in the shooting" and never tried to "shift the blame to appellants"].)

Instead, the transcript of the jailhouse conversation shows Angel was angry that authorities were attempting to blame him for the entire crime, and only identified Garcia as the shooter and Michael as the driver at the prompting of the informants, and after already having implicated himself in the crime. Moreover, throughout the discussion he provided conflicting versions of what had occurred, further mitigating his role in the offense with each successive telling. Under such circumstances, we conclude Angel's statements identifying Garcia as the shooter and Michael as the driver of the vehicle from which the shots were fired, were not admissible as declarations against his interest.[12]

---

[12] Numerous other statements in the 40-page transcript (some of which reference the co-defendants), do not appear to fall within the against interest exception. For example, the transcript includes numerous (sometimes lengthy) exchanges between the informants that essentially narrate their understanding of what happened. In other portions of the transcript, Angel relates information law enforcement had told him about the investigation. In still other portions, Angel makes statements that do not appear inculpatory in any way. For the purposes of appeal, we need not address whether these additional categories of statements were properly admitted as declarations

### *3. The error was not harmless*

The Attorney General argues that even if we conclude the court erred in admitting the portions of Angel's confession that identified Garcia as the shooter and Michael as the driver, the error was harmless. Evidentiary rulings are generally subject to harmless error review under the standard in *People v. Watson* (1956) 46 Cal.2d 818, 836 (see *People v. DeHoyos* (2013) 57 Cal.4th 79, 120; see *People v. Page* (2008) 44 Cal.4th 1, 42), which requires us to determine "if a reasonable probability exists that the jury would have reached a different result had this evidence been excluded." (*People v. Whitson* (1998) 17 Cal.4th 229, 251.)

Several factors convince us that the evidentiary error in this case cannot be deemed harmless. First, Angel's erroneously admitted statements were highly prejudicial, directly identifying Garcia as the shooter and Michael as the driver of the vehicle. Second, apart from Angel's jailhouse confession, all of the prosecution's evidence of guilt was circumstantial in nature. Although the prosecution's evidence indicated the co-defendants were in the area together when the shootings occurred, and that a vehicle matching the make and model of Michael's car was seen, there were no eyewitnesses, nor was there any surveillance footage of the actual shooting. There was no fingerprint or DNA evidence directly linking any of the defendants to the firearm that was used to commit the offense. In sum, while the circumstantial evidence was certainly incriminating, we do not agree with the prosecution's assertion that it was "overwhelming."

---

against interest (or on some other basis). Garcia and Michael are, however, free to raise these issues at any subsequent retrial.

35

Third, the jury's verdicts provide persuasive evidence that Angel's statements played a pivotal role in their deliberations. The jury found Garcia guilty of first degree murder, Angel and Michael guilty of second degree murder, and did not reach a verdict with respect to Felipe Ramos, who was the only defendant not referenced in Angel's statement. We may reasonably infer that the jury convicted Garcia of first degree murder because it believed he was the shooter. The only evidence of that fact, however, consisted of Angel's statements identifying him as the shooter. It is also reasonable to infer that part of the reason the jury could not reach a verdict with respect to Felipe Ramos was because he was not mentioned in Angel's jailhouse statement.

Based on the highly incriminating nature of Angel's statements, the lack of any other evidence directly tying Garcia and Michael to the crime and the jury's verdicts, there is a reasonable probability the jury would have reached a different result had the statements been excluded. (See generally *People v. Mendoza* (1967) 251 Cal.App.2d 554, 559 ["When the extrajudicial statement of a codefendant is [erroneously] admitted in evidence . . ., and the said statement inculpates the nondeclarant as [a] central figure in the commission of the crime, and the other evidence as to the guilt of the non-declarant presents a close question, the error must be considered as prejudicial"].) We therefore reverse the judgments of conviction against defendants Garcia and Michael.

If the prosecution elects to retry Garcia and Michael, and seeks to admit portions of Angel's jailhouse statement other than those we have found inadmissible, the trial court should conduct an individualized inquiry to determine whether each statement the prosecution seeks to admit was sufficiently against Angel's

36

penal interest to warrant admission under section 1230, or is otherwise admissible against Garcia and Michael on some other basis. (See *Grimes*, *supra*, 1 Cal.5th at p. 716 ["Ultimately, courts must consider each statement in context in order to [determine admissibility under section 1230]"]; *U.S. v. Smalls* (10th Cir. 2010) 605 F.3d 765, 786 [trial court erred by excluding entire confession that included some statements that were admissible as against penal interest, and remanding with directions to "determine what parts of [defendant's] extended confession are sufficiently against his penal interest and therefore admissible"].)

### C. Angel's Jailhouse Statements Are not Inadmissible Under Penal Code Section 4001.1

Although Angel has not asserted any hearsay or confrontation clause challenges to the admission of his jailhouse statements against him, he contends his entire conversation should have been excluded pursuant to Penal Code section 4001.1, subdivision (b):[13]

> (b) No law enforcement agency and no in-custody informant acting as an agent for the agency, may take some action, beyond merely listening to statements of a defendant, that is deliberately designed to elicit incriminating remarks.

Angel does not dispute the informants in this case were merely posing as inmates, and therefore do not qualify as "in-custody informants acting as an agent for the agency." (See §§

---

[13]  Michael and Garcia join Angel's argument on this issue.

4001.1, subd. (c); 1127 [defining "in-custody informant" as "a person . . . whose testimony is based upon statements made by the defendant while both the defendant and the informant are held within a correctional institution"].) Angel contends, however, that subdivision (b) nonetheless applies because the investigating law enforcement agency took an "action"–hiring paid informants to interrogate Angel–that was deliberately designed to elicit incriminatory remarks.

Even if we assume section 4001.1 applies to informants who were merely posing as inmates, it is clear the statute does not apply where, as here, the conduct at issue was intended to elicit incriminating remarks about uncharged offenses. Section 4001.1 was added by Stats. 1989, c. 901, which includes the following provision: ""It is the intent of the Legislature that subdivision (b) of Section 4001.1 of the Penal Code is a restatement of existing case law and where the language in that subdivision conflicts with the language of that case law, the decisions of *Kuhlmann v. Wilson*, 91 L.Ed.2d 364, and *United States v. Henry,* 65 L.Ed.2d 115, and other United States Supreme Court decisions which have been decided at the time this act is enacted shall be controlling." *Kuhlmann* and *Henry* both involved an application of the Supreme Court's ruling in *Massiah v. United States* (1964) 377 U.S. 201, which "held that, once a defendant's Sixth Amendment right to counsel has attached, he is denied that right when federal agents 'deliberately elicit' incriminating statements from him in the absence of his lawyer." (*Kuhlmann v. Wilson* (1986) 477 U.S. 436, 457 (*Kuhlmann*).)

In *Henry* (1980) 447 U.S. 264 (*Henry*), the Court held the defendant's Sixth Amendment right to counsel had been violated

when a government jailhouse informant deliberately elicited incriminating information about a charged offense. (*Id*. at pp. 269-270.) In *Kuhlmann*, *supra*, 477 U.S.436, however, the Court concluded no Sixth Amendment violation had occurred where the police had instructed an informant to merely listen to the defendant, and report any incriminating information he might disclose regarding a charged offense. (*Id*. at pp. 459-460.)

The prohibition set forth in *Massiah* and its progeny (including *Henry* and *Kuhlmann*) "is offense-specific; that is, it applies only to "'offenses as to which adversary judicial criminal proceedings have been initiated'" [citations], such proceedings including "'formal charge, preliminary hearing, indictment, information, or arraignment.'" [Citation.]" (*People v. Thornton* (2007) 41 Cal.4th 391, 434.) Thus, *Massiah* does not apply to "[i]ncriminating statements pertaining to . . . uncharged offenses, as to which the Sixth Amendment right has not yet attached[.]" (*People v. Bradford* (1997) 15 Cal.4th 1229, 1313; see also *Maine v. Moulton* (1985) 474 U.S. 159, 180.)

Given the Legislature's express pronouncement that section 4001.1, subdivision (b) is intended to codify principles of law reflected in *Henry* and *Kuhlmann*, we decline to extend the statute to law enforcement conduct that is designed to elicit incriminatory remarks regarding uncharged offenses. Because Angel's conversation with the informants occurred before he had been charged with any of the offenses at issue in this case, section 4001.1 is inapplicable.[14]

---

[14] Angel also argues all of his statements to the informants were "involuntary," and therefore inadmissible under the due process clause, because there is evidence in the record that: (1) he

### D. The Court Did Not Commit <u>Bruton</u> Error in Admitting the Custodial Statement of Felipe Ramos

Garcia and Michael argue the trial court violated the *Aranda/Bruton* rule by admitting certain statements co-defendant Felipe Ramos provided to law enforcement during a custodial interrogation. Specifically, Michael objects to the admission of Ramos's statements that Ramos arrived at the

---

felt compelled to speak to the informants, who "appeared to be active, high ranking Surenos" gang members; and (2) the informants "pretend[ed] to be his allies and repeatedly assured him he had no need to worry about being prosecuted." As Angel acknowledges in his appellate brief, however, neither he nor any other defendant raised this objection in the trial court proceedings. "[A] claim of involuntariness generally will not be addressed for the first time on appeal." (*People v. Ray* (1996) 13 Cal.4th 313, 339; see also *People v. Kennedy* (2005) 36 Cal.4th 595, 612 [disapproved on other ground in *People v. Williams* (2010) 49 Cal.4th 405, 458-459].) Angel has provided no argument why that general rule is inapplicable here. We therefore deem this due process claim to be forfeited.

Angel further asserts that if a forfeiture occurred, his trial counsel's failure to raise an involuntariness objection constituted ineffective assistance. "On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Hung Thanh Mai* (2013) 57 Cal.4th 986, 1009.) Angel has not shown any of these factors apply to his ineffective assistance claim. His claim is therefore more appropriate for resolution in a habeas proceeding.

recycling facility in a gray Ford Explorer, and that he entered the passenger side of the vehicle when leaving the facility.  Michael contends such statements implicated him in the crime because his mother owned a gray Explorer, and also because the statements implied Ramos was at the recycling facility with at least one other person.  Garcia objects to Ramos's statements that a white Ford Expedition was also present at the recycling facility, and that after leaving the facility, Ramos followed the white Expedition to Santa Fe Avenue.  Garcia contends these statements directly implicated him in the crime because other evidence at trial established he owned a white Expedition.  The court declined to excise these portions of the transcript, but instructed the jury that it could only consider Ramos's statements against Ramos, and no other defendant.

The Attorney General does not dispute Ramos's statements to law enforcement were testimonial, and that the *Aranda/Bruton* rule therefore precluded the trial court from admitting any portion of Ramos's statement that facially incriminated his co-defendants.  The Attorney General argues, however, that none of the information Ramos provided in the challenged statement was sufficiently incriminatory toward Michael or Garcia to warrant its exclusion under *Bruton.*

In *Richardson v. Marsh* (1987) 481 U.S. 200, the United States Supreme Court clarified the scope of its holding in *Bruton*: "In *Bruton* . . . [w]e held that a defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant."  (*Id.* at p. 207.)  The Court further clarified, however, that the rule of

41

*Bruton* was inapplicable where "the confession was not incriminating on its face, and became so only when linked with evidence introduced later at trial. . . . [¶] Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. . . ." (*Id*. at p. 208.) Under *Marsh*, "[t]he class of inferentially incriminating statements [that are subject to the *Bruton* rule] is limited to 'obvious[ ]' ones, 'inferences that a jury ordinarily could make immediately, even were the confession the very first item introduced at trial.' [Citation.]" (*People v. Montes* (2014) 58 Cal.4th 809, 867.)

Ramos's statements that he drove to the recycling facility in a gray Ford Explorer, that he entered the passenger side of the vehicle when leaving the facility and that he then followed a white Expedition to Santa Fe Avenue did not "facially incriminate" Michael or Garcia, nor did the statements create an "obvious inference" that those co-defendants participated in the shooting. Ramos never admitted his vehicle or the vehicle he followed were involved in the shooting. Moreover, Ramos did not make any specific reference to any of his co-defendants, or provide any other identifying information about who he was driving with, or who he was following. To the extent Ramos's statements were incriminating toward Michael and Garcia, they became so only when linked with a substantial amount of additional evidence related to the crimes.

### E. The Trial Court Correctly Concluded that Accomplice Testimony Admitted Under the Declaration Against Interest Exception Does Not Require Corroboration

Garcia and Michael argue the trial court erred when it denied their request to instruct the jury on the need for corroboration of accomplice testimony. (See CALCRIM No. 335.) In the trial court proceedings, Garcia and Michael argued the instruction was necessary in light of the court's decision to admit Angel's jailhouse statement against them. The court declined to provide the instruction, explaining that the corroboration requirement, codified in Penal Code section 1111,[15] applies only to "testimony," and is therefore inapplicable to "out-of-court statements that were . . . . declarations against interest."

To the extent the trial court concluded the corroboration requirement does not apply to any form of out-of-court statements, it was mistaken. Our Supreme Court has explained that the term "'[t]estimony,' as used in section 1111, includes "'all out-of-court statements of accomplices . . . used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police.'" [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 555.) The trial court was correct, however, that section 1111's corroboration

---

**15** Section 1111 states, in relevant part: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

43

requirement is inapplicable to an out-of-court statement that is admissible as a declaration against interest. (See *Brown, supra*, 31 Cal.4th 518 [where an accomplice's statement is admissible as a declaration against interest, "no corroboration [is] necessary, and the court [is] not required to instruct the jury to view [the [accomplice's] statements with caution and to require corroboration"].)

We have already found that Garcia and Michael's convictions must be reversed based on the trial court's erroneous admission of portions of Angel's jailhouse statements. At any retrial of those defendants, the trial court need not instruct the jury on corroboration of accomplice testimony with respect to any out-of-court statement admitted against them under the declaration against interest exception. In assessing the need for such an instruction with respect to any other form of accomplice statements that may be admitted against them, the trial court must comply with *Brown, supra*, 31 Cal.4th 518.

### F. The Trial Court Did Not Err in Instructing the Jury on Attempted Premeditated Murder

Angel contends the trial court erred in instructing the jury on whether the attempted murders were willful, deliberate and premeditated.[16] Angel objects to the italicized portion of the instruction below, which is patterned on CALCRIM No. 601:

> "The attempted murder was done willfully and with deliberation and premeditation *if the defendant or the defendant Smith Garcia or both of them acted with that state of mind.*"

---

[16] Michael joins Angel's argument on this issue.

Angel argues this instruction erroneously permitted the "jury to find [him] guilty of premeditated, deliberate attempted murder based on [his co-defendant's ] state of mind." Angel acknowledges the California Supreme Court has previously held that an accomplice may be found criminally liable for attempted premeditated murder based on the mental state of the principal (see *People v. Lee* (2003) 31 Cal.4th 613), but contends that decision is no longer valid in light of two subsequent decisions, *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), and *Alleyne v. United States* (2013) 133 S.Ct. 2151.

### 1. *Summary of relevant law*

"Subdivision (a) of section 664 of the Penal Code (section 664(a)) provides that, as a general matter, a person guilty of attempted murder must be punished by imprisonment for five, seven, or nine years. It goes on to provide, however, that, 'if the [murder] attempted is willful, deliberate, and premeditated . . ., the person guilty of that attempt shall be punished by imprisonment . . . for life. . . .'" (*Lee, supra*, 31 Cal.4th at p. 615.) Section 664(a)'s increased punishment for attempted premeditated murder "does not create a greater degree of attempted murder, but rather constitutes a penalty provision increasing the punishment for attempted murder beyond the maximum otherwise prescribed, when the murder attempted was willful, deliberate, and premeditated." (*Ibid*.)

In *Lee, supra,* 31 Cal.4th 613, the Court addressed "whether section 664(a) requires that in order to be punished with life imprisonment for attempted murder as an aider and abettor, an individual must personally act with willfulness, deliberation, and premeditation." (*Id.* at p. 616.) The Court concluded the statute did not include any such requirement,

explaining: "[S]ection 664(a) makes no distinction between an attempted murderer who is guilty as a direct perpetrator and an attempted murderer who is guilty as an aider and abettor, nor does it draw any distinction between an attempted murderer who personally acted with willfulness, deliberation, and premeditation and an attempted murderer who did not so act." (*Id*. at p. 623.)  Thus, the Court continued, "section 664(a) properly must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally acted with willfulness, deliberation, and premeditation, even if he or she is guilty as an aider and abettor."  (*Id*. at p. 627.)

In *People v. Favor* (2012) 54 Cal.4th 868, the Court extended *Lee* to aider and abettor liability for attempted premeditated murder under the natural and probable consequences doctrine.  The defendant in *Favor* was charged with attempted premeditated, murder.  "Under the prosecution's theory at trial, defendant was guilty of the target offense of robbery as an aider and abettor, and of the nontarget offense of attempted murder as a natural and probable consequence of the robbery."  (*Id*. at p. 874.)  The trial court instructed the jury that to find defendant guilty of attempted murder, it had to find he committed a robbery; that during the commission of the robbery, a co-participant committed the crime of attempted murder; and that "'a reasonable person in the defendant's position would have known that the commission of attempted murder was a natural and probable consequence of the commission of the robbery.'" (*Id*. at p. 875.)  On the premeditation allegation, the court instructed the jury under CALCRIM No. 601, explaining that "[t]he attempted murder was done willfully and with deliberation

46

and premeditation if either the defendant or a principal or both of them acted with that state of mind." (*Ibid*.)

On appeal, the defendant argued "that the trial court failed to instruct that the jury had to find, not only that the attempted murder was a natural and probable consequence of the robberies, but also that the perpetrator's willfulness, deliberation, and premeditation were natural and probable consequences." (*Favor*, *supra*, 54 Cal.4th at p. 875.) The Court, relying in part on its prior holding in *Lee*, rejected the argument: "Because section 664(a) 'requires only that the attempted murder itself was willful, deliberate, and premeditated' [citation], it is only necessary that the attempted murder 'be committed by one of the perpetrators with the requisite state of mind.' [Citation.] Moreover, the jury does not decide the truth of the penalty premeditation allegation until it first has reached a verdict on the substantive offense of attempted murder. [Citation.] Thus, with respect to the natural and probable consequences doctrine as applied to the premeditation allegation under section 664(a), attempted murder–not attempted premeditated murder–qualifies as the nontarget offense to which the jury must find foreseeability. Accordingly, once the jury finds that an aider and abettor, in general or under the natural and probable consequences doctrine, has committed an attempted murder, it separately determines whether the attempted murder was willful, deliberate, and premeditated." (*Id*. at pp. 879-880.)

Two years later, in *Chiu*, *supra*, 59 Cal.4th 155, the Court addressed whether a defendant may be convicted of "first degree premeditated murder under the natural and probable consequences doctrine." (*Id*. at p. 162.) After examining the doctrinal bases of the natural and probable consequences

47

doctrine, the Court concluded that this vicarious form of aider and abettor culpability was incompatible with premeditated murder, which involves "a mental state [that] is uniquely subjective and personal." (*Id*. at p. 167.)  The Court further explained that "the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences doctrine, especially in light of the severe penalty involved." (*Ibid*.)

In its analysis, *Chiu* distinguished *Lee* and *Favor*, explaining that those decisions had involved a "determination of legislative intent as to whom [section 664(a)] applies." (*Chiu*, *supra*, 59 Cal.4th at p. 163.)  The Court identified multiple additional reasons why *Favor* was "not dispositive" (*id*. at p. 163): "[U]nlike *Favor*, which involved the determination of premeditation as a requirement for a statutory penalty provision, premeditation and deliberation as it relates to murder is an element of first degree murder. . . . Finally, the consequence of imposing liability for the penalty provision in *Favor* is considerably less severe than in imposing liability for first degree murder under the natural and probable consequences doctrine." (*Ibid*.)

### 2. *The court did not err in instructing the jury on attempted premeditated murder*

As summarized above, both *Lee* and *Favor* have approved the portion of the CALCRIM No. 601 that Angel now challenges, holding that "an aider and abettor need not share the heightened mental state of the direct perpetrator for the applicability of section 664(a)'s penalty provision.  [Citation]." (*Favor, supra*, 54 Cal.4th at p. 879; see also *Lee, supra*, 31 Cal.4th at p. 627.)

Although Angel acknowledges these prior holdings, he contends *Chiu* effectively overruled those decisions. According to Angel, under *Chiu*, a defendant may not be subject to section 664(a)'s enhanced penalty provision unless the jury finds he or she personally acted with willfulness, deliberation, and premeditation. As our summary of *Chiu* makes clear, however, that decision addressed only whether a person may be convicted of first degree premeditated murder under the natural and probable consequences doctrine, and specifically distinguished *Lee* and *Favor*. Simply put, there is no language in *Chiu* that overrules or otherwise questions the continuing validity of *Lee* or *Favor*.

Angel also argues *Lee's* holding that an accomplice may be subjected to an enhanced penalty for attempted premeditated murder based on the direct perpetrator's state of mind is "open to question in light . . . of . . . the United States Supreme Court's decision in *Alleyne*, *supra*, 133 S.Ct. 2151." In *Alleyne*, the Court held that any fact which increases a mandatory minimum sentence qualifies as an element of the crime that must be submitted to the jury. (*Id*. at p. 2155.) According to Angel, under *Alleyne*, "the distinction [the California Supreme Court has] drawn between the status of premeditation and deliberation as an element of first degree murder and the status of those same mental states as merely an increased penalty provision of attempted murder contravenes the United State Constitution and is therefore invalid."

*Alleyne* was decided approximately one year before *Chiu*. Although *Chiu* addressed *Lee* and *Favor* at length, it did not mention *Alleyne*, or provide any indication that *Alleyne* had

49

undermined its prior holdings in those cases.  We presume the Supreme Court was aware of *Alleyne* when it issued *Chiu*.[17]

Moreover, at least as applied in this case, we fail to see how section 664(a)'s sentencing enhancement for attempted premeditated murder violates the rule of *Alleyne*.  Under the statute, a defendant cannot be subjected to the enhanced penalty provision unless the jury finds two facts beyond a reasonable doubt: (1) the defendant committed an attempted murder; and (2) the defendant or his accomplice committed the attempted murder with premedication.  Indeed, section 664(a) expressly provides that the "additional term provided . . .  for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is . . . found to be true by the trier of fact.'"  Thus, an enhanced penalty cannot be imposed under section 664(a) unless the jury makes a true finding on the question of premeditation.

---

[17]    The effect of *Alleyne* on *Favor*, if any, is currently under review in *People v. Mateo* (Feb. 10, 2016) B258333, review granted May 11, 2016, S232674.  The informal description of the question before the Court in *Mateo* reads, "In order to convict an aider and abettor of attempted willful, deliberate and premeditated murder under the natural and probable consequences doctrine, must a premeditated attempt to murder have been a natural and probable consequence of the target offense?  In other words, should *People v. Favor* (2012) 54 Cal.4th 868 be reconsidered in light of *Alleyne v. United States* (2013)____U.S.____[113 S.Ct. 2151] and *People v. Chiu* (2014) 59 Cal.4th 155" (Available at http://www.courts.ca.gov/documents/OCT1317crimpend.pdf, as of December 2017.)

## DISPOSITION

The judgments of Smith Garcia and Michael Gallardo are reversed, and those matters are remanded for further proceedings.  The judgment of Angel Gallardo is affirmed.


ZELON, J.


We concur:


PERLUSS, P. J.


BENSINGER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.