Filed 12/18/23  P. v. Stevenson CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B321803 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA081176) |
| v. | |
| LAMAR DUWAN STEVENSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Daviann L. Mitchell, Judge.  Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Marc A. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

\* \* \* \* \* \* \* \* \* \*

Defendant and appellant Lamar Duwan Stevenson appeals from his conviction of first degree murder and a sentence of 25 years to life, plus 10 years. Defendant contends hearsay statements of a codefendant were improperly admitted, the statements were not supported by the requisite corroboration, the prosecutor committed misconduct during closing argument, and the court violated newly amended Penal Code sections 1170 and 1170.1 by imposing the upper term on the firearm enhancement.

We affirm.

## FACTUAL AND PROCEDURAL SUMMARY

In November 2020, Cory McAlpine was fatally shot at an apartment complex in Palmdale where friends had gathered for a birthday party. Two of the female partygoers, T.J. and N.M., testified as prosecution witnesses. (We refer to the two witnesses only by their initials to protect their privacy.) Video footage recovered from several security cameras in the apartment complex captured some of the activity before and after the shooting. The shooting itself was not captured on video.

T.J. was the girlfriend of the victim, McAlpine, and they had a young son together. McAlpine was a Hoover gang member known as Groove.

Other gang members were at the party, including defendant, who is a Neighborhood Crip with the moniker Skatt, and two of his friends, Trippy and Delvon Carnell Moore-Gulley (Gulley). Trippy and Gulley were members of the 10th Street gang (also known as Dime Bloc), which was associated with the Neighborhood Crips and rivals of McAlpine's gang.

Early that evening, T.J. had an argument with McAlpine because he did not want her to go to the party, but she went

2

anyway since it was for her sister. At some point, McAlpine arrived at the party.

Before heading to the party, N.M. drove to a liquor store to buy some alcohol, and defendant accompanied her. N.M. had her handgun with her in a bag. It was a .38- or .357-caliber revolver—the same caliber revolver used to kill McAlpine. Defendant knew she had the gun. When they arrived back at the apartment complex, N.M. left her gun in the bag underneath the front passenger seat.

About an hour before the shooting, defendant got into an "animated" or "heated" argument with McAlpine. Gulley and Trippy were standing nearby. N.M. saw the argument but could not hear what was said. Video footage captured the argument. McAlpine walked away after the argument and did not return to the apartment where most of the party guests were still hanging out and drinking.

Shortly thereafter, defendant went inside the apartment and asked N.M. for her car keys. She gave them to him without asking why he wanted them. Video footage captured defendant walking in the parking lot area with Gulley. Defendant was holding a lanyard with keys that looked like N.M.'s keys. N.M. said she did not see defendant return to the party, and another friend later returned her car keys to her.

Video footage taken around 3:00 a.m. showed both Gulley and Trippy walking in the direction of a courtyard in the complex where McAlpine's body was eventually found. There was no video from the courtyard area itself. A couple of minutes later, another segment of video showed defendant and McAlpine also walking in the direction of the courtyard. At 3:05 a.m., video footage captured Gulley and Trippy running away from the

courtyard area and defendant walking in a different direction. Shortly thereafter, video showed defendant and Trippy meet up in a different area of the complex and leave together on foot.

T.J., who was still at the party and unaware of any shooting, realized her cell phone was missing. She used a friend's cell phone to call her own number and defendant answered her phone. Defendant told her he must have grabbed her phone by mistake and that he had found her phone in N.M.'s car. They agreed to meet at N.M.'s house so that T.J. could retrieve the phone. When T.J. arrived at N.M.'s house, defendant was there with Trippy. T.J. got her phone from defendant. Shortly thereafter, her sister called and told her to come back to the apartment because something had happened to McAlpine.

Meanwhile, N.M. heard a commotion outside the apartment and heard someone say there had been a shooting. N.M. was frightened, and she collected her things to leave. She left with her wife, another friend and her kids. When N.M. got into her car to drive everyone home, she saw her bag on the front passenger seat, not under it, where she had left it, and her gun was missing.

N.M. returned to her home on 10th Street. About 20 or 30 minutes later, defendant showed up alone. N.M. asked where was her gun, and he told her he had gotten rid of it. When she asked what happened, defendant said something to the effect that " 'Oh, that nigga got what he had coming.' " Cell phone location data confirmed that defendant was in the vicinity of N.M.'s home after the time of the shooting.

Later, when N.M. was interviewed, she said defendant scared her. She did not understand why he had shot McAlpine. N.M. later received threats about her involvement in this case

4

and was given assistance in relocating for her safety. T.J. also testified she did not want to talk to law enforcement about anything that happened because she was scared of being seen as a snitch.

McAlpine died from a single gunshot wound to his face. Ballistics analysis on the bullet recovered from McAlpine's neck showed the murder weapon was a .38- or .357-caliber revolver. No shell casings were recovered at the scene, consistent with the murder weapon being a revolver. Photographs of the crime scene showed glass from a broken bottle near McAlpine's body.

Defendant was charged with one count of murder (Pen. Code, § 187, subd. (a); count 1) and one count of being a felon in possession of a firearm (§ 29800, subd. (a)(1); count 2). As to count 1, it was alleged defendant personally used a firearm in the commission of the offense. (§ 12022.5, subd. (a).)

Gulley was charged as a codefendant in the murder. Just before the start of the first trial in April 2022, Gulley pled no contest to voluntary manslaughter and was sentenced to an upper term of 11 years.

Defendant proceeded to trial. The jury in the first trial could not reach a verdict and the court declared a mistrial. Defendant was retried in June 2022. Before opening statements, defendant admitted he suffered a prior felony conviction in 2006 for purposes of count 2 only.

When the prosecution called Gulley as a witness, he refused to testify. Gulley was held in contempt and given another opportunity to testify, and he refused again. The court declared him unavailable as a witness and admitted, over defendant's objection, selected portions of Gulley's out-of-court statement describing aspects of the shooting. The prosecutor's

5

closing argument included comments about Gulley's refusal to testify. We reserve a more detailed discussion of Gulley's out-of-court statements and the prosecutor's argument to parts 1 and 3, respectively, of the Discussion below.

The jury found defendant guilty of first degree murder (count 1) and being a felon in possession of a firearm (count 2), and found true the personal firearm use allegation on count 1. The court sentenced defendant to a term of 25 years to life on count 1, plus a 10-year upper term for the firearm enhancement. The court imposed and stayed a two-year midterm on count 2. The court awarded defendant 443 actual days of presentence custody credits.

This appeal followed.

## DISCUSSION

1. **Gulley's Out-of-court Statements Were Properly Admitted.**

Defendant contends the court violated his rights to due process and a fair trial by admitting Gulley's out-of-court statements. Defendant says the statements were not admissible as statements against penal interest because Gulley only spoke about facts that implicated defendant but not himself. Defendant says the evidentiary error was prejudicial because there was no physical evidence linking him to the crime and only Gulley identified him as the shooter. "We review a trial court's decision whether a statement is admissible under Evidence Code section 1230 for abuse of discretion." (*People v. Grimes* (2016) 1 Cal.5th 698, 711 (*Grimes*).) We find no abuse of discretion in the admission of the statements.

### a. Background

After Gulley was arrested, he refused to be interviewed and made no incriminating statements when an undercover operative was placed in a holding cell with him. Thereafter, two Dime Bloc gang members, who were arrested on an unrelated matter, were placed in Gulley's cell which, unbeknownst to all of them, was equipped to record their conversations. Over the course of several hours, Gulley made various statements to his fellow gang members about the shooting of McAlpine.

When called to testify at trial, Gulley refused. After being held in contempt and being declared unavailable, the prosecution presented, over defendant's objection, 11 passages culled from the jail cell recordings.

In two passages, Gulley related some of what led up to the shooting of McAlpine: (1) " '[N.M.], cuz and I go outside, smoke a cigarette. Cuz tell me, 'where [N.M.] park at?' I said, 'I don't know, there behind the gate.' That where her car, woo, woo, had a strap. He tell me, 'Hey, walk with me real quick.' I walk with cuz. Cuz was like, 'Yeah, woo, woo, woo, Nigga, on the hood, I'm gonna smoke cuz. On Neighborhood Crip *** get away with it.' I started laughing, said, 'Nah cuz, leave cuz alone, bro.' " (2) "Cuz tellin me this as he went to get the strap. 'Nigga, on Neighborhood Crip, I'm gonna kill cuz. I'll show you inside how to fuckin' get away with it, on the hood. Neighborhood, come watch this nigga.' No talkin', walk up and blow cuz's head off." (Other testimony explained that saying "on Neighborhood" meant doing something for the gang.)

Gulley also said defendant told McAlpine (referring to him by his moniker Groove) " 'I don't like how you talked to me and stuff.' " In several passages, Gulley referenced "Snoova," a

7

derogatory term for the Hoover gang and that McAlpine was shot once in the face: (1) "[F]uck Snoova. Boom! One shot. Cuz over with." (2) "Face, head. Blew his shit off."

Gulley twice emphasized how close he was when defendant shot McAlpine: (1) "Cuz, I was this close. This close." (2) "I was close, cuz. When the bottle, when the bottle, I, I think some ricochet bust the bottle or when I hit the ground, the bottle bust. But when the bottle bust, that shit split open."

Gulley also said several times that he told defendant to leave it alone. "Skatt was on cuz. That's why I had to tell cuz, 'Bro, just leave.'" Gulley also said defendant believed McAlpine had drugs. "He talkin about nigga had drugs. Nigga had nothing. He had a black sweater on and some shorts. Cuz got his pockets checked and all that."

### b. Analysis

The declaration against interest exception to the hearsay rule allows for the admission of an out-of-court statement by a declarant "if the declarant is unavailable as a witness and the statement, when made . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." (Evid. Code, § 1230.)

In *Grimes*, the Supreme Court explained that the admissibility of a declaration against interest must be assessed from the context in which it was made. The "contextual approach accords with the rationales underlying the modern expansion of the rule governing the admission of statements against interest." (*Grimes, supra*, 1 Cal.5th at p. 717.) In resolving whether an out-of-court statement is against the declarant's penal interest " ' within the meaning of Evidence Code section 1230, and hence

8

is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Id.* at p. 711.)

Moreover, "the nature and purpose of the against-interest exception does not require courts to sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant." (*Grimes*, *supra*, 1 Cal.5th at p. 716.) Courts are permitted "to consider whether the portion of a confession that tends to exculpate another, rather than to shift blame or curry favor, should be admitted in view of surrounding circumstances, even though the exculpatory portion of the statement is not independently disserving of the declarant's interests." (*Id.* at p. 715.)

While Gulley's statements assign more culpability to defendant, identifying him as the shooter, Gulley nonetheless implicated himself as an accomplice in the shooting. Gulley acknowledged going with defendant to N.M.'s car, after pointing out that it was behind the gate when asked by defendant where N.M. had parked, and saying that the car "had the strap" in it. Gulley admitted knowing defendant was angry with McAlpine and that his intent was to kill him. He said defendant thought McAlpine had disrespected him, that he was going to kill him, and he would show Gulley how to get away with it. Gulley continued to accompany defendant after defendant declared his intent, multiple times, to kill McAlpine and was apparently standing right next to defendant when the fatal shot was fired.

These statements reasonably subjected Gulley to criminal liability as an aider and abettor in the death of McAlpine, and

9

they were made under circumstances which rendered them sufficiently trustworthy to be admissible.  Gulley was speaking with fellow gang members with whom he was friendly, not with law enforcement, and he spoke using words that could be reasonably construed as boasting about the crime and his role in it.  Gulley was not making the statements to curry favor with the authorities or deflect responsibility.  (See, e.g., *People v. Greenberger* (1997) 58 Cal.App.4th 298, 335 ["most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures"].)

Defendant relies heavily on *People v. Gallardo* (2017) 18 Cal.App.5th 51 (*Gallardo*) in arguing that Gulley's statements should have been excluded.  His reliance on *Gallardo* is misplaced.

*Gallardo* concluded that a declarant's statements identifying two other individuals as the shooter and the driver of the vehicle from which the shots were fired were not admissible as declarations against interest.  (*Gallardo*, *supra*, 18 Cal.App.5th at p. 76.)  In so holding, *Gallardo* cited several factors, none of which is present here.  The trial court in *Gallardo* admitted the entire 40-page transcript of the declarant's conversation with undercover operatives without any redaction of collateral and inadmissible statements.  (*Id.* at p. 72.)  The declarant made his remarks not to friends or confidants in a noncoercive setting but to undercover operatives who directed and prompted most of the more incriminating revelations.  (*Id.* at p. 75.)  The trustworthiness of the statement was further undermined by the fact the declarant made clear from the very outset of the statement that he was angry with authorities for

10

trying to blame the crime entirely on him, and he gave "conflicting versions of what had occurred, further mitigating his role in the offense with each successive telling." (*Id*. at pp. 73, 75-76.) There is nothing analogous with the facts surrounding Gulley's out-of-court statements here.

Finally, defendant argues Gulley never expressly admitted he assisted defendant in the murder. But that is not the standard for admissibility set forth in *Grimes*. The trial court did not abuse its discretion in allowing the admission of his statements.

## 2. There Was Sufficient Corroborating Evidence.

Defendant argues that a reversal is warranted even if we conclude Gulley's out-of-court statements were properly admitted, because the record does not contain corroborating evidence in support of those statements and no other evidence linked him to the murder. We do not agree.

Penal Code section 1111 requires accomplice testimony to "be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense." (*Ibid*.) But, " ' "it is not necessary that the corroborative evidence be sufficient in itself to establish every element of the offense charged." ' " (*People v. Zapien* (1993) 4 Cal.4th 929, 982.) "[E]vidence of corroboration is 'sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth.' " (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 304.) Corroborating evidence may be entirely circumstantial, as well as " ' "slight and entitled to little consideration when standing alone." ' " (*Zapien,* at p. 982.)

The evidence recited above was ample corroboration of Gulley's statements linking defendant to the fatal shooting.

11

3.  **The Prosecutor Did Not Commit Misconduct During Closing Argument.**

Defendant contends the prosecutor improperly vouched for Gulley's credibility during argument. Defendant says the prosecutor's assertion that everyone was afraid of defendant and that he too would be scared to testify gave credence to Gulley's refusal to testify and likely made his statements about defendant more credible to the jury. He says it was prejudicial and the court's brief admonition to the jury was insufficient to cure the harm as evidenced by the fear the jurors expressed the next day in their note requesting an escort. We disagree.

a.  **Background**

In his closing argument, the prosecutor responded to defense counsel's argument about Gulley's refusal to testify by saying, "I think we all know why [Gulley] doesn't want to talk. Why nobody in this case wants to talk. It has to be pulled out of people, extracted like [from] a dentist chair. Because everybody is afraid of [defendant]. [¶] And especially Mr. Gulley. He's scared to death of him because he killed somebody for no reason right in front of him. I know I would be scared to death of that person. If you put me up there and I had to say something about them, I wouldn't say a word."

Defense counsel objected that was improper argument, and the court sustained the objection. The prosecutor concluded his argument shortly thereafter. No further objections were made. Immediately after the prosecutor finished, the judge turned to the jury and said, "Ladies and gentlemen, I'm going to read you a brief instruction regarding the objection that was sustained: I'm going to invite you to disregard any personal vouching as to any

12

statements that were made by [the prosecutor] as to personally vouching as opposed to his argument."

After the jury was excused, defense counsel made a motion for mistrial which the court denied.

The next day, before the start of the afternoon session, the jury informed the court they had a verdict. The jury also sent out a note saying they believed someone from the audience may have been taking video of them on a cell phone. They requested that deputies escort them from the building and that their identifying information be permanently sealed. The court admonished everyone in the courtroom that recording the jurors was absolutely prohibited. The court then asked who in the audience was suspected of doing the recording. (The reporter's transcript is unclear to whom the question was directed.) An individual was asked to step forward, and his cell phone was checked and found not to contain any footage of the jurors. The court then took the verdict, dismissed the jurors, and ordered they be escorted to their cars. Defendant did not raise any objection to the court's handling of the matter in this fashion.

### b.    Analysis

"Under California law, to establish reversible prosecutorial misconduct a defendant must show that the prosecutor used ' "deceptive or reprehensible methods" ' and that it is reasonably probable that, without such misconduct, an outcome more favorable to the defendant would have resulted. . . . A prosecutor's misconduct violates the federal Constitution if the behavior is ' " ' " ' "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process." ' " ' " ' " (*People v. Caro* (2019) 7 Cal.5th 463, 510 (*Caro*),

13

citation omitted; accord, *People v. Covarrubias* (2016) 1 Cal.5th 838, 894 (*Covarrubias*).)

Where, as here, misconduct is alleged to have occurred during closing argument, we must consider the objected-to remarks in the context of the prosecutor's argument as a whole and the court's instructions to the jury. (*Covarrubias, supra*, 1 Cal.5th at p. 894.) " 'In conducting [our] inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Ibid.*)

A prosecutor is entitled to comment on the credibility of any witness based on facts contained in the record and any reasonable inferences that may be drawn from those facts. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1329.) Impermissible vouching occurs when a prosecutor assures the jury a witness is credible or suggests there is evidence available to the government but not presented to the jury that corroborates the witness's testimony. (*People v. Cook* (2006) 39 Cal.4th 566, 593; *Seumanu,* at p. 1329.) Vouching in either case is objectionable because such "prosecutorial comments may be understood by jurors to permit them to avoid independently assessing witness credibility and to rely on the government's view of the evidence." (*Cook,* at p. 593.)

The prosecutor did not vouch for Gulley here. The prosecutor's brief argument that Gulley refused to testify out of fear was reasonably based on evidence in the record. There was evidence from both T.J. and N.M. that they were scared to testify or speak to the authorities. N.M. and Detective Mark Marbach both testified about N.M. receiving threats and being given relocation assistance for her safety. Detective Marbach also said in cases involving gang members, most witnesses were fearful

14

and did not want to be involved.  It was not unreasonable for the prosecutor to argue that Gulley refused to testify out of fear.  The prosecutor did not belabor the point, and his argument as a whole focused on the evidence and the jury instructions.

To the extent the prosecutor's remarks did constitute vouching, the court promptly admonished the jury.  The jurors were instructed that nothing the attorneys said was evidence (CALCRIM No. 104), and that they alone were the judges of witness credibility (CALCRIM No. 105).  (*Caro*, *supra*, 7 Cal.5th at p. 511 [claimed vouching was harmless given the strength of the evidence and the jury instruction that credibility was for the jury alone to decide].)

## 4.     **Defendant Forfeited His Claim of Sentencing Error.**

Defendant argues he is entitled to a new sentencing hearing because the trial court failed to comply with the requirements of newly amended Penal Code sections 1170 and 1170.1 by imposing the upper term of 10 years on the firearm use enhancement instead of the presumptive midterm of four years.

At the start of the sentencing hearing, the court asked the parties to focus their arguments on the firearm use enhancement, noting it was the only aspect of the sentence where the court had discretion.  The prosecution argued for an upper term, and defendant argued that, based on the amended statute, nothing greater than the midterm would be proper.

Before imposing sentence, the court described the murder as "horrific" with the victim having been "shot in the face at point blank range."  The court also acknowledged the amendments to Penal Code sections 1170 and 1170.1, saying "I'm aware of the new law.  I know there were no findings made by [the] jury."  The court then said it was not limited to relying on jury findings

15

under the new law, saying it could refer to the court file which included defendant's probation report. "Defendant's probation report indicates his prior convictions as an adult are numerous and of increasing seriousness, and I do find that from the court file. I do not need a jury finding on that to elevate it to [the] high term. [¶] In addition, the defendant has served a prior prison term. He was given probation. He was unsuccessful and was sentenced to prison not long before this occurred. [¶] Furthermore, I think just the nature of the case itself and the conviction represents that the defendant has engaged in violent conduct that indicates he's a serious danger to society."

The court went on to explain that, even if an appellate court were to find it was inappropriate to rely on defendant's dangerousness as an aggravating factor, the court would still impose the high term "just from the defendant's prior convictions [which] are numerous and increasing [in] seriousness; and, in addition, he served a prior prison term."

At no point did defendant object to the court's reliance on the probation report and defendant's criminal history as the bases for imposing the upper term. Defendant had previously stipulated to a prior felony conviction. Because no objection was raised, the contention has been forfeited.

## DISPOSITION

The judgment of conviction is affirmed.


GRIMES, J.


WE CONCUR:

STRATTON, P. J.    VIRAMONTES, J.