Filed 4/14/25  P. v. Renteria CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ANTHONY RENTERIA and ROSALIO PARTIDA,<br><br>    Defendants and Appellants. | B327157; B327161<br><br>Los Angeles County Super. Ct. Nos. YA094808, YA094808-01 |

APPEALS from judgments of the Superior Court of Los Angeles County, Scott T. Millington, Judge.  Affirmed with corrections.

Jeralyn B. Keller, under appointment by the Court of Appeal, for Defendant and Appellant Anthony Renteria.

Corey J. Robins, under appointment by the Court of Appeal, for Defendant and Appellant Rosalio Partida.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Idan Ivri and Yun K. Lee, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Rosalio Partida and Anthony Renteria had separate trials for the murder of a gang rival. Both trials featured confessions each defendant made to undercover agents in jail. Both defendants now appeal their convictions for first degree murder. Renteria claims his confession was involuntary based on his youth. Partida levels multiple challenges to his murder conviction. The prosecution notes the mandatory assessments imposed on both defendants are incorrect. We affirm both judgments but order the trial court to correct the assessments as we direct. Undesignated code citations are to the Penal Code.

I

We begin by reviewing the evidence in Partida's trial favorably to the judgment. We separate into subsections the many confessions in this case, which are a focus of Partida's appeal. We discuss the proceedings in Renteria's trial later as necessary to resolve his sole appellate challenge regarding his jailhouse statements.

A

Late one night in August 2016, a car drove by a house on West 103rd Street in Inglewood where the victim, Brandon Lopez, lived. A little while later, the car passed a second time. Surveillance video shows two men walking to an SUV backed into the driveway of the victim's home. One of the men approaches the passenger side and appears to shoot. There are several flashes of light. Then the two men run off in the direction they came. Another video shows the original car speed off.

Lopez's friend Roberto Ramirez was with Lopez that night. After they got to Lopez's house, they "chilled" in the SUV. Ramirez noticed the car drive by Lopez's house a couple times and slow as it passed. He thought he saw two or three people inside it. Both he and Lopez fled when gunshots rang out. Afterwards, Lopez was lying on the ground by his front door.

The parties stipulated Lopez had been shot five times and died from his wounds.

A neighbor whose home overlooked 103rd Street heard the gunshots and saw a purplish or burgundy Dodge Neon roll through a stop sign and turn.

Police found expended cartridge casings and fired bullets at the scene. The SUV had six bullet holes on the front passenger door and window.

Nearly three weeks after the shooting, police responded to a call about people loitering in a car at an apartment complex. The Dodge Neon they found was "like a maroon/burgundy color with black paint on top of it." The police saw two men and a gun inside the car. They also found narcotics. They arrested the driver, Partida, and the passenger, Ramiro Chavez.

A criminalist examined the gun and three bullets from Lopez's body and determined this gun fired the shots that killed Lopez.

At Partida's home, police found a bullet of the same caliber as the bullets used in the shooting.

B

Detective Jack Aranda, who had been investigating the shooting, learned Partida and Chavez had been arrested in a Dodge Neon. The day after their arrest, he had them placed in a jail cell with two informants posing as inmates as part of a

3

*Perkins* operation, a recorded undercover operation named for *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*). One informant spoke more than the other and seemed to be an older, experienced inmate.

Partida introduced himself as "Rascal from Tepa." Chavez said he was "Little Snaps from Tepa." Tepa 13 is a gang whose territory spills into Inglewood.

Partida and Chavez talked with the informants about getting caught. Police crept up on them and caught Chavez "with the blammer" (gun) while they were "chillin' . . . doing some lines and shit[.]" Partida said he had just cleaned the gun. He was going to "miss that shit."

Aranda briefly entered the cell with paperwork showing the faces of Lopez, Partida, and Chavez. "187" and "In-Custody" also appeared. Aranda introduced himself and mentioned he was "from Homicide." He said he would get to them about a murder on 103rd but did not know if it would be that day or the next. Then he left.

Chavez expressed surprise, began cussing, and said he "didn't do shit, nigga." Partida agreed and told him, "Don't trip, my boy." The main informant mentioned the paper in Aranda's hand, and Chavez continued to deny he did anything. Someone soon led Chavez out of the cell.

Partida immediately told the main informant he had a dream that he got 23 years on a case. He said Chavez was stressing him out. "I'm, like, trying to calm him[.]" Referring to Aranda's visit, Partida said he saw the picture and heard "homicide" and, "I was like . . . Fuck." Then he lowered his voice and admitted he had the bullets at his house. He confirmed they were the same ones he "used on that shit[.]" "I'm gonna be

4

fucked." He asked the informant if he should get rid of the bullets.

Partida went on to describe the shooting. He and Chavez ran into Lopez, who was from a rival gang called Lennox. They got in a car chase with him earlier in the day and then lost him. Partida explained: That fool was "rolling around." "They came to our hood." "We bumped heads."

Partida was driving his mother's purple Dodge Neon that day. Chavez asked to be dropped off, so Partida took him home and picked up two "new booties" (new gang members)—Cartoon and Kid. Cartoon is Renteria's nickname. He had just joined Tepa. Partida was older and had been in the gang for several years.

Chavez knew about the victim. He called Cartoon and said, " 'Go to 103, 103. Go to 103. That fool's gonna be there.' " The other three went there and looked for Lopez. Partida spotted him seated low in the passenger seat of a car. "That fool was there." "[W]e caught him slippin'."

Partida alerted his passengers, who got "pumped up." They had heard Lopez was "with other homies," but Partida saw him by himself. Partida circled back and told his passengers to look for cameras. He turned his headlights off and parked three houses away. It was late, and there were no streetlights.

Cartoon and Kid got out while Partida turned the car around and waited. Cartoon shot the guy a couple times and ran back to the car. Partida drove away with the headlights off. He did not think he was on camera, and he did not touch the bullets.

Partida said his homies "fucked up by claiming the hood when they did that." He had warned them not to do this and told them that's "how fools get caught up[.]" He suspected someone

heard them. Partida and the main informant seemed amused by the others' bravado.

After the shooting, Partida cleaned his mother's car and painted it black. He told Cartoon to burn his clothes, "burn everything." Partida wanted to bury the gun, but Chavez kept asking for it because they "were getting caught slippin' by Lennox" and it was the only gun they had. Partida cleaned the gun and let Chavez have it.

Police caught them with the gun several weeks after the shooting. By then, he and Chavez had discussed what happened. Chavez "wasn't in it" though and was not there.

Partida believed someone was snitching. He learned he had no bail. He spoke as if the game was up: "I already seen it coming." "Then I . . . connect the dots."

C

After Partida confessed, he was taken out of the jail cell, and Chavez returned. Chavez repeatedly told the main informant he was not "there" and "didn't do shit."

Like Partida, he talked about the day of the shooting: There was a chase with the victim earlier in the day. They had seen the fool "around the hood." Partida was driving his mother's car and dropped him off. Chavez eventually acknowledged that he called "the other homie" and said the "fool" from Lennox was on 103rd and " 'Just hit 103rd.' " Then the others "did the shit[.]"

After the shooting, Partida cleaned the gun. He told Chavez what happened, reporting "that shit was hot."

D

Chavez also confessed to Aranda in a video-recorded interview conducted after the *Perkins* operation.

6

Aranda began the interview with warnings required by *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).  Chavez initially claimed he was an inactive Tepa member who went by "Lil Slick."  He spoke about events leading up to his arrest, leaving Aranda unconvinced.  Aranda reminded Chavez he was the one holding the murder weapon and warned Chavez should start talking or he would go down for the murder.

Chavez eventually explained what happened.  He had been hanging out with Partida, Cartoon, and Kid that day.  Partida was driving his mother's car.  He dropped off the other two, both of whom recently joined their gang.  Chavez and Partida then "ran into that fool from Lennox."  Partida dropped off Chavez and picked up Cartoon and Kid again.  Cartoon shot the guy from Lennox to put in some work for the gang.  He bragged about it afterwards.

Partida later gave Chavez the gun, saying it had "been around" but had been "cleaned up."  Police caught them with it in the car used for the shooting, which Partida had spray-painted black.

Chavez said he would take Aranda to Cartoon's house.  He asked that Aranda not tell anyone that he talked.  Chavez repeatedly said he "didn't do" that murder and was not there.

E

Aranda also interviewed Partida after the *Perkins* operation.  This interview similarly began with *Miranda* warnings and was video recorded.

Partida confirmed he was Rascal from Tepa, he had been a member for three years, and he had an unfinished "T" tattoo on his face.  Regarding the shooting, Partida repeatedly denied he was there and initially gave a story Aranda did not believe.  He

7

admitted he drove his mother's Dodge.  He said he recently painted it black because it looked "girly."

Aranda repeatedly told Partida to tell the truth and said other things seemingly to get the truth.  Eventually, Partida admitted he "fucked up" and he "was there."  "That's all I'm gonna say" he said next.

F

In September 2016, police arrested Renteria.  As with the others, they placed Renteria in a jail cell with undercover agents who recorded the conversation.

Renteria introduced himself to the informants as Cartoon from West Side Tepa.  He said he had just been "jumped in," and they had been going at it with Lennox.

Aranda briefly entered the cell to introduce himself.  He said he might talk to Renteria later about a murder on 103rd.  Aranda had a flyer showing Renteria's and the victim's faces.  The informants referred to the paperwork after Aranda left.  Renteria later said two of his "homies"—Rascal and Lil Snapper—"got busted" but only one had something to do with "that shit."  The second guy "wasn't a part of it[.]"

Renteria described the murder, primarily to one informant.  He was with Rascal and Kid.  The victim, who was from Lennox, was "posted in his car."  They knew he was there because they had seen him; he lived "in the hood[.]"  The victim had chased Renteria's homie with a gun and had been "patrolling, . . . running through the hood" earlier in the day.  "[W]e're, like, what the fuck, you know?  Like, all right, you know?"  Renteria confirmed they went "gangbanging" that night.

Rascal drove his mother's car.  They checked for cameras.  "[T]hat's why we, you know, it happened, because we scoped it

8

out.  It looked all cool."  Renteria and Kid walked over to the victim while Rascal stayed in the car.  They caught the victim "slippin'."  He didn't expect it.  "[M]y homeboy's, like, 'Tepa west side, fool.'  And then, chu, chu."  Renteria claimed he shot the victim five times, three times in the chest.

Afterwards, Rascal painted the car black and took back the cleaned gun.  He and "Snaps" got caught with it in enemy territory a couple weeks later.  Only Rascal was involved in the shooting.

Renteria was "not really" remorseful about killing.  "I did it for the hood."

G

The prosecution played each recording for the jury, who also received written transcripts of the conversations.  The trial court warned the transcripts were not evidence but guides to assist the jury in following the recordings.

H

Chavez obtained immunity and testified at trial.  On direct examination, he confirmed he was with Partida the day of the shooting.  Partida was driving a purple Dodge Neon.  They had seen the victim in the neighborhood and had a sense "where he was at, where he used to be around."  Partida dropped off Chavez that evening and said he was going to pick up Cartoon.  Chavez could not recall an earlier incident with the victim.

The next day at Cartoon's house, Partida told him about the shooting.  He said he drove Cartoon and Kid.  He parked while Cartoon hopped out "did the crime"—a shooting.  Partida seemed "proud" when talking about it.  Renteria confirmed he was the one who "shot the guy from Lennox."

9

On cross-examination, Chavez admitted saying "just hit 103rd" but denied telling the others to kill the guy or intending that they kill. He recognized his comment could implicate him in a murder but denied he was involved. Chavez did not recall being part of a plan to shoot Lopez or learning of any plan.

Chavez testified he was with Partida a few weeks later in the same car, which now was black. Partida had the gun on him and told Chavez to hold it while he sipped a beer. Chavez had seen Partida with the gun before. He put the gun in his pocket. Soon after, police showed up, saw the gun, and arrested them. Partida told Chavez to pass him the gun, but it was stuck in Chavez's pocket. At the police station, Partida told Chavez the gun was the one " 'we used on the fool from Lennox.' "

Chavez also testified about Tepa 13. He, Partida, and Renteria were members in August 2016. Chavez had been in the gang for five to six years at this point, and Partida joined before Chavez. Guns were important to their gang for dealing with rivals. Lennox 13 was their rival. Tepa would consider it disrespectful for a Lennox member to patrol around Tepa territory, and if Tepa had a weapon, they probably would use it to respond. Chavez acknowledged there are many ways to disrespect or harm a rival, gangs retaliate when this happens, and there are no rigid rules about how to respond. In Tepa 13, there was no shot caller; you could "run your own program" and do what you wanted to do.

Chavez explained he was dishonest with Aranda at first because he had to follow the gang code of not snitching, and he was trying to protect Partida. He had known Partida for four years at that point. He ultimately told the truth because he did not want to "go down" for something he did not do. Aranda's

10

paperwork concerned him greatly. He felt "like scared" during Aranda's visit to their cell. Partida also seemed nervous, scared.

I

The jury learned more about Tepa 13 and its rivalry with neighboring Lennox 13 from the prosecution's gang expert. These two gangs were each other's biggest rival and constantly fought and shot each other. "[T]hey really hate each other." Lopez's house is in Tepa territory.

According to the expert, gang members protect their territory by patrolling it and looking for rivals. Typically, younger members are more active in "putting in work" or committing crimes, while older members oversee the youngsters. "[T]he more active ones are constantly shooting others, constantly fighting, constantly committing crimes[.]" Gang members gain status and respect through their crimes, particularly violent crimes. Gangbanging means "actively represent[ing] the gang by committing crimes."

After the prosecution rested, the defense had testimony by the victim's mother read to the jury. In her testimony, the woman described her last evening with her son, her vehicle, and her son's access to it.

The jury deliberated for less than two hours and convicted Partida of first degree murder (§ 187, subd. (a)) and of shooting at an occupied vehicle. (§ 246.)

A separate jury convicted Renteria of the same crimes and found true the allegation that Renteria personally and intentionally discharged a firearm causing death. (See § 12022.53, subd. (d).)

For the murder counts, the trial court sentenced each defendant to 25 years to life. Renteria received three additional

11

years for a reduced firearm allegation.  The court stayed the sentences on the second count for each defendant.

Both defendants appealed, and we consolidated their appeals.  We address Partida's contentions first.

## II

Partida challenges the sufficiency of the evidence supporting his murder conviction.  He contends the trial court erroneously admitted his and Renteria's *Perkins* statements and his key confession to Aranda.  He argues the court should have allowed him to examine the undercover agents but should not have allowed Chavez to testify as to his state of mind.  He maintains the court should have instructed the jury that Chavez and Renteria were accomplices as a matter of law.  He additionally seeks reversal based on ineffective assistance of counsel and cumulative error.

Most of these claims are erroneous.  We assume two errors for purposes of argument, but these assumed errors were harmless.  We address each argument in turn.

## A

Partida claims there was insufficient evidence of the requisite mental state for first degree murder.  We apply the familiar substantial evidence standard of review (*e.g.*, *People v. Mendoza* (2011) 52 Cal.4th 1056, 1068–1069 (*Mendoza*)) and conclude sufficient evidence supports the verdict.

The record contains substantial evidence of the requisite intent for aiding and abetting murder and the hallmarks of premeditation and deliberation:  planning activity, preexisting motive, and manner of killing.  (See *Mendoza, supra*, 52 Cal.4th at p. 1069; see also *People v. Curiel* (2023) 15 Cal.5th 433, 466 & 468 [aiding and abetting murder requires the aider know the

12

perpetrator's unlawful purpose and intend to facilitate or encourage the murder].)

The recorded statements here create a reasonable inference Partida planned the murderous attack on rival Lopez using new, younger Tepa members to avenge the earlier car chase and to warn against further Lennox incursions into Tepa territory. Partida, Renteria, and Kid acted in unison, in a premeditated fashion, to defend their gang territory. They targeted Lopez after learning his whereabouts, and they surveyed the area before attacking. Renteria selected a method of assault ensuring death: shooting Lopez repeatedly in the chest at close range. Kid claimed Tepa aloud during the attack.

Partida enabled the deadly attack, led it, and took steps to ensure its success. He was the elder gang member of the three. The reasonable inference from the evidence is he supplied the gun and the bullets. He chose to strike at night when the victim seemingly was alone. He warned the new recruits not to claim their gang to prevent witnesses from tying them to the shooting. He drove by the victim's house looking for cameras and witnesses. He kept his headlights off for the attack and the getaway. He parked his car several houses away from the scene and any camera that might catch the shooting. He turned the car around so as to flee once the job was done. Afterwards he painted the car.

Far from expressing surprise about the result afterward when discussing the shooting with Chavez, Partida was proud. In jail, Partida's comments about the murder and his tone signaled the shooting was expected. His tone is apparent from listening to the recording.

13

A rational jury could have concluded this evidence showed Partida's intent to have Lopez killed, premeditation, and deliberation.  Contrary to Partida's arguments, explicit admissions about his knowledge or intent were unnecessary. (See *People v. Sanchez* (2016) 63 Cal.4th 411, 457 (*Sanchez*) ["Because direct evidence of a defendant's intent rarely exists, intent may be inferred from the circumstances of the crime and the defendant's acts"].)

Partida emphasizes evidence favorable to him, such as testimony explaining the many ways besides murder to "put in work" for gangs and acknowledging gang members may go "rogue" and act independently.  He also argues for different inferences from the evidence, such as Partida's instruction not to claim Tepa.  We decline Partida's invitation to reweigh the evidence and to draw different inferences.  (See *People v. Brady* (2010) 50 Cal.4th 547, 561 & 564 [appellate courts do not resolve factual conflicts and must accept logical inferences the jury might have drawn from the evidence]; see also *Mendoza, supra*, 52 Cal.4th at p. 1069 ["When the circumstances reasonably justify the jury's findings, a reviewing court's opinion that the circumstances might also be reasonably reconciled with contrary findings does not warrant reversal"].)

Partida leans on Chavez's testimony in arguing for reversal.  Chavez testified *he* did not recall being part of a plan to shoot Lopez or learning of a plan.  Chavez also confirmed Partida never *said* he intended to kill when he went to 103rd Street. These facts do not erase the substantial evidence showing there was a plan to kill Lopez among Partida, Renteria, and Kid.

14

Crediting the evidence favoring the jury's verdict and drawing reasonable inferences to support the judgment, Partida's substantial evidence challenge fails.

B

Partida claims the transcript of his *Perkins* operation has many "unintelligible" or "inaudible" notations, and the trial court erred and deprived him of various constitutional rights by denying his motion to produce the agents to testify about these portions. He speculates these parts could have related to his mental state and been exculpatory and assumes the agents would have remembered "unintelligible and missing parts" of this conversation that took place more than six years before trial.

We will assume for argument that Partida preserved each of the many sub-issues and claims of error he now raises, and that the court should have let him examine the agents regarding his own jailhouse comments from six years earlier. Nevertheless, any error was harmless beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).) Nothing suggests the unintelligible parts were exculpatory, and the context refutes this claim. (See *People v. Powell* (2021) 63 Cal.App.5th 689, 715 & 718 [error harmless under *Chapman* if it is unimportant in relation to everything else the jury considered regarding the defendant's liability for murder, as revealed in the record].)

Partida's statements about the crime made during the *Perkins* operation were incriminating from top to bottom. He confessed his involvement in the shooting soon after entering the jail cell, and he painted a detailed picture of it. Throughout his confession, Partida kept his voice low and calm. He had a resigned air. As he explained to the main informant, he had

15

connected the dots: "I already seen it coming." When they discussed how his homie "smoked that fool" from Lennox, there was no shock or indignation. Partida took ownership for the shooting, for example, by admitting "we caught [the victim] slippin" and by confirming the bullets he had at home were the same ones he "used on that shit[.]" He made clear his motive was retribution. He noted his homies had "fucked up"—not because they killed but because they decided to "claim the hood" when doing so.

The informant's responses to Partida's statements show Partida was not making exculpatory statements about his state of mind. Assertions to the contrary are raw speculation.

The recording shows the unintelligible and inaudible portions Partida complains of in the transcript are in fact tiny moments in a stream of incriminatory comments. Sometimes it appears nothing was said at all during these moments, or the main informant simply cut Partida off. Other times the context shows Partida's unintelligible comment in fact was incriminatory, such as when Partida signaled he drove that night because of cameras.

Beyond Partida's *Perkins* statements, other evidence showed Partida aided and abetted in the planned killing of their gang rival: Chavez's and Renteria's *Perkins* statements, Partida's and Renteria's statements to Chavez, Chavez's confession to Aranda, and Chavez's testimony. These statements painted a consistent and clear picture of the shooting, as well as of Partida's motive and intent.

In short, refusing to allow Partida to examine the undercover agents about "missing" parts in the transcript did not prejudice Partida and did not deny him a fair trial.

16

## C

Partida contends the trial court should have excluded entirely his statements to the undercover agents. He appears to argue admitting them violated his Fifth Amendment right to remain silent because he had invoked this right the day before the *Perkins* operation, and this operation amounted to a coercive custodial interrogation to which *Miranda* applied. He also claims the "coordinated scheme" resulting in his confession to the informants violated due process and other rights. These arguments are incorrect. We address the *Miranda* claim first and then the remaining claims.

### 1

Under *Miranda* and the Fifth Amendment, "courts may admit statements made by suspects during a custodial interrogation only if police first warn suspects of their rights," but no warnings are required "when suspects give voluntary statements to a person they do not know is a police officer." (*People v. Rodriguez* (2019) 40 Cal.App.5th 194, 198 (*Rodriguez*), citing *Perkins*, *supra*, 496 U.S. at p. 294.)

Recall police arrested Partida and Chavez almost three weeks after the shooting, after finding them in the Dodge Neon with narcotics and a gun. At the police station, police sought to conduct a drug recognition evaluation and read Partida his *Miranda* rights. Partida invoked his right to remain silent.

The next day, Partida and Chavez separately discussed the shooting with paid informants in jail. They were not *Mirandized*. After confessing to the informants, Partida met with Aranda and eventually invoked his right to remain silent during the interview. At the trial court, defense counsel moved to exclude Partida's *Perkins* statements on the basis of *Miranda*.

17

We follow *People v. Felix* (2024) 100 Cal.App.5th 439 (*Felix*) and *People v. Orozco* (2019) 32 Cal.App.5th 802 (*Orozco*) and conclude the trial court properly overruled Partida's objection because the *Perkins* operation did not amount to a custodial interrogation and did not violate Partida's earlier invocation of *Miranda.* (See *Orozco, supra,* 32 Cal.App.5th at pp. 811 & 814 ["*Miranda*'s rule has a limit: It only applies when the suspect-defendant was the subject of 'custodial interrogation' " and "there is no 'interrogation' when a suspect speaks with someone he does not know is an agent of the police"].)

This case is like *Felix.* Partida invoked his Fifth Amendment rights with police near the time of his arrest, which concerned one crime (drug possession). Later he freely spoke with informants he believed to be fellow inmates about another crime (murder). (See *Felix, supra,* 100 Cal.App.5th at pp. 450 & 451.) Aranda entered the jail cell mid-conversation, but he did not interrogate Partida, and Partida made no incriminating statements then. Instead, he waited for the detective to leave "and then resumed his voluntary conversation with the undercover [agents] . . . . His subsequent incriminating statements were not the result of coercive interrogation and were properly admitted." (*Id.* at p. 452; see also *Rodriguez, supra,* 40 Cal.App.5th at p. 198 ["*Miranda* does not protect suspects when they describe criminal activities to people they think are cellmates"].) We return to the coercion issue in the next section.

Aranda testified he set up the operation and entered the cell to get the suspects to talk about the crime. This was permissible. Police may orchestrate the operation and may employ strategic deception that is unlikely to procure an untrue statement. (*See People v. Fayed* (2020) 9 Cal.5th 147, 165

18

(*Fayed*); *Orozco, supra*, 32 Cal.App.5th at pp. 817 & 819–820; *Felix*, *supra*, 100 Cal.App.5th at p. 450.) Nothing about this recorded conversation suggests the informants' or Aranda's actions were likely to produce untrue statements by Partida, and he does not argue otherwise.

Partida barely mentions *Orozco* and argues this case is distinguishable from *Felix*. He urges us to adopt the dissent in *Felix* and the views of another state's high court and of esteemed jurists in this state and beyond. We do not abandon precedent.

2

The prosecution claims Partida forfeited any argument beyond his *Miranda* argument because he did not object on any other basis at the trial court. We reach Partida's due process argument because he also raises ineffective assistance of counsel. While Partida's opening brief also mentions in passing Partida's right to counsel and to present a defense, Partida forfeited these issues by inadequately briefing them.

Due process permits only voluntary confessions. (See *Rodriguez, supra*, 40 Cal.App.5th at p. 199.) To determine whether a confession was voluntary, courts assess the circumstances to see if the defendant's will was overborne. (*Ibid.*; *Fayed*, *supra*, 9 Cal.5th at p. 165.)

Our independent review shows Partida's statements to the informants were voluntary. The trial court properly admitted them.

In the jail cell, Partida and Chavez introduced themselves to the informants and spoke with them without hesitation. The group laughed about getting caught and other things.

Partida decries the "tag-team approach" here and emphasizes that Aranda entered the jail cell with paperwork

19

about the murder featuring him and that the informants capitalized on this visit. Aranda's visit was extremely brief. He was matter of fact, not menacing. He did not ask any questions. While Chavez sounded worried afterwards, Partida sounded stoic and commented, "That's why I don't got bail." He tried to reassure Chavez and coolly mentioned his dream involving a 23-year sentence. When Chavez left the cell, Partida made clear *Chavez* was stressing him out—not Aranda—and he was trying to calm his "boy."

The main informant referred to the paperwork and asked questions, but this was not coercion. The informant's behavior did not intimidate Partida into speaking or overcome his will. Partida transitioned immediately from discussing the paperwork to confessing: he lowered his voice and whispered he had the bullets. Then he sought advice about getting rid of them. Partida's many other admissions flowed after this.

Partida confessed early on, and he did so "freely and at his own peril." (*Rodriguez*, *supra*, 40 Cal.App.5th at p. 198.) His calm voice and his tone reflected this. Partida appeared to view the main informant as an experienced inmate he could trust. The informant was posing as a fellow inmate, not usurping the role of counsel or exerting improper influence, as Partida suggests.

Partida notes he and Chavez were only 21 and 20 years old, respectively, at the time of the operation. As we discuss further in section III when considering Renteria's appeal, relative youth does not establish coercion.

Partida's confession to the informants was voluntary and admissible. (*See Fayed*, *supra*, 9 Cal.5th at pp. 165–166 [defendant's confession was voluntary where the government agent sympathized with the defendant and coaxed and prodded

him when he was hesitant to speak; these tactics were not likely to procure an untrue statement]; *Orozco, supra,* 32 Cal.App.5th at pp. 808-809, 819–820 [no due process violation where police orchestrated a monitored conversation between the defendant and his girlfriend that resulted in the defendant's confession; police interrupted the conversation to discuss the crime, to warn of criminal consequences, and to ask if they had anything to say].)  Admitting the confession was proper.

D

Partida similarly claims admitting Renteria's *Perkins* statements was prejudicial error that violated his confrontation and due process rights, as well as California statutory law. These claims, too, are incorrect.

1

Partida's confrontation clause claim hinges on whether Renteria's statements are testimonial.  Partida acknowledges "California courts have held that statements unknowingly made to an informant, or between fellow prisoners, are not testimonial."  He nevertheless argues Renteria's statements were testimonial because police agents elicited them through questioning and worked in tandem with a detective to obtain evidence for use at trial.

Partida does not explain how Renteria's situation meaningfully differs from cases like *People v. Arauz* (2012) 210 Cal.App.4th 1394 (*Arauz*) involving accomplices who made statements to jailhouse informants assisting police and who are unavailable for cross-examination at trial.  Like Partida, the defendants in *Arauz* claimed police had prepped the paid informant and had conducted a de facto interrogation through him.  (*Id.* at pp. 1397, 1400, 1402.)  Aranda's quick appearance at

the jail cell did not render Renteria's later voluntary statements to the informants testimonial.

"Where, as here, an accomplice inculpates himself and his codefendant to a fellow inmate/informant, his statements, if trustworthy, are admissible in the codefendant's trial. Such statements are declarations against penal interest, are not 'testimonial,' and their admission does not violate the confrontation clause . . . ." (*Arauz, supra,* 210 Cal.App.4th at p. 1397; see also *People v. Gallardo* (2017) 18 Cal.App.5th 51, 68 (*Gallardo*) [where there was no evidence a codefendant knew he was speaking to police informants or otherwise anticipated his statements would be used prosecutorially, his statements were nontestimonial and did not implicate confrontation rights].)

Renteria's statements were trustworthy, were not testimonial, and did not implicate the confrontation clause. We expand on the trustworthy nature of the statements in sections II(F) and III below but note here that Renteria unwittingly confessed to informants he believed were fellow inmates. Partida does not argue the statements were unreliable. "The fact that [Renteria] made a series of highly incriminating remarks to the informants, essentially admitting his complicity in the shootings, provides persuasive evidence that he did not know his statements might be used at trial." (*Gallardo, supra,* 18 Cal.App.5th at p. 68, fn. 9.)

2

Partida also maintains admitting Renteria's statements violated both due process and Evidence Code section 352 (section 352) because the statements were duplicative of others' statements and Partida could not cross-examine Renteria. According to Partida, "[t]he evidence Renteria was the gunman

22

and that appellant was the driver was uncontradicted in appellant's trial, and the only question was appellant's intent[.]" Renteria's *Perkins* statements offered nothing on this point, he argues, but they allowed the jury to speculate as to Partida's mental state.

Partida concedes his trial counsel did not object based on section 352. He does not challenge the trial court's ruling that Renteria's statements were declarations against interest under Evidence Code section 1230, which *requires* the declarant be unavailable as a witness and thus unavailable for cross-examination.

The trial court did not abuse its discretion under section 352 or violate Partida's due process rights. Courts have broad discretion under this section, and their "routine application of the Evidence Code does not implicate constitutional rights." (*People v. Jones* (2013) 57 Cal.4th 899, 949 & 957; see also *Arauz, supra*, 210 Cal.App.4th at pp. 1402–1403 ["Federal due process rights are not implicated where the disputed evidence is relevant and admissible to show intent, motive, identity, knowledge, common plan, and gang status"].)

Renteria's statements overlapped with others' statements to an extent, but they also provided unique and important insight into the shooting and the threesome's murderous plan. According to Renteria, Tepa recently had been *going at it* with Lennox. "[T]hat fool" (Lopez) had just chased Renteria's homie *with a gun* and had been "patrolling, . . . running through the hood." *So they went gangbanging*. The shooting happened only after they "scoped it out" and determined "[i]t looked all cool."

Renteria also distanced Chavez from the shooting, which was important to understanding Chavez's role as a potential accomplice, as we explain further below.

In short, Renteria's statements were highly probative. Playing them for the jury did not consume much trial time. Partida failed to establish that the trial court abused its discretion in admitting them under the Evidence Code or that their admission rendered his trial fundamentally unfair.

E

Partida claims the trial court erroneously admitted his confession to Aranda that he "was there." In one section of his brief, he argues this comment was coerced and involuntary. In a later section, he argues that, even though his trial counsel did not raise the issue, the court should have excluded his statement under *Missouri v. Seibert* (2004) 542 U.S. 600 (*Seibert*). Partida concedes the disputed comment established neither mental state nor an act satisfying an element of the crime.

Any error in admitting the challenged statement or in failing to assert a *Seibert* objection was harmless beyond a reasonable doubt. Ample evidence delineated Partida's role in Lopez's murder. This other evidence went well beyond simply placing Partida at the scene, which is all the challenged statement does. As Partida recognizes, the evidence that he was the driver "was uncontradicted" in his trial.

Excluding Partida's statement to Aranda would have made no difference. (See *People v. Caro* (2019) 7 Cal.5th 463, 495; see also *id.* at p. 493 [admitting the defendant's statements that "did not have high value in the overall evidentiary calculus" was harmless beyond a reasonable doubt].) There was no prejudice, under any notion of the term. (See *People v. Johnsen* (2021) 10

24

Cal.5th 1116, 1165 [ineffective assistance of counsel claim requires deficient performance by counsel that prejudiced the defense].)

F

Partida next contends it was prejudicial error not to instruct the jury that Chavez and Renteria were accomplices as a matter of law and that their statements required corroboration.

The trial court gave no accomplice instruction as to Renteria. For Chavez, the court used CALCRIM Nos. 301 and 334, instructing the jurors, among other things, that they should determine whether Chavez was an accomplice, and that accomplice testimony used against the defendant should be viewed with caution and must be supported by other evidence connecting the defendant to the crimes.

Section 1111 is the source of the requirement for corroborating evidence. It defines an accomplice as "one who is liable to prosecution for the identical offense charged against the defendant on trial" and provides that no conviction can be based on accomplice testimony that is not corroborated by other evidence tending to connect the defendant to the crime. (§ 1111; *People v. Coffman & Marlow* (2004) 34 Cal.4th 1, 103, 105.)

The trial court properly refused to instruct that Chavez was an accomplice as a matter of law, as his status as an accomplice was not "clear and undisputed." (See *People v. Williams* (2008) 43 Cal.4th 584, 636; see also *ibid.* ["Unless there can be no dispute concerning the evidence or the inferences to be drawn from the evidence, whether a witness is an accomplice is a question for the jury"].) "The *court's* task was not to determine whether the jury *could* reasonably find [Chavez] was an accomplice, but rather whether it could *only* reasonably find that

25

he was an accomplice." (*People v. Bryant, Smith & Wheeler* (2014) 60 Cal.4th 335, 430 (*Bryant*).)

Chavez testified he never told the others to kill someone and he did not intend for Lopez to be killed. In the first *Perkins* operation, Partida repeatedly confirmed Chavez "didn't do shit" and said Chavez "wasn't in it[.]" In the second *Perkins* operation, Renteria similarly confirmed Chavez was not involved in the murder and "wasn't a part of it[.]" Chavez also told both Aranda and the jury he was not involved in the murder.

This evidence on Chavez's intent and role in Lopez's killing made his status as an accomplice a jury question. It did not permit the "clear and undisputed" inference that he was an accomplice. (See *Bryant, supra*, 60 Cal.4th at p. 430 [providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish someone is an accomplice].)

Partida attacks Chavez's credibility, noting even the trial court questioned it at one point. Undermining Chavez's credibility, or pointing to his grant of immunity, does not render the facts undisputed and does not show he was an accomplice to murder as a matter of law.

As for Renteria, no corroboration was required for his out-of-court statements, and no related instruction was required, because his statements properly came into evidence as declarations against penal interest. (See *People v. Brown* (2003) 31 Cal.4th 518, 555–556 (*Brown*); see also *Gallardo, supra*, 18 Cal.App.5th at p. 81 ["The trial court was correct . . . that section 1111's corroboration requirement is inapplicable to an out-of-court statement that is admissible as a declaration against interest"].)

26

Partida does not dispute that Renteria's statements qualified for this hearsay exception. His reply brief admirably acknowledges *Brown* may apply to these statements and then focuses entirely on Chavez.

Renteria admitted he was the shooter. He admitted he was part of a threesome seeking payback against a gang rival. Renteria made these admissions to someone he believed was a fellow inmate. His statements were trustworthy and were against his penal interest. (See Evid. Code, § 1230; *Gallardo*, *supra*, 18 Cal.App.5th at pp. 70, 72.) These statements did not trigger the accomplice instructions he urges on appeal. (See *Brown*, *supra*, 31 Cal.4th at pp. 555–556.)

G

Partida contends the trial court should not have let Chavez testify that Partida seemed proud when talking about the shooting. Partida appears to claim the testimony was irrelevant and speculative, lacked a proper foundation, and amounted to improper lay testimony.

This testimony was proper.

As background, Chavez on direct examination told the jury what Partida said about the shooting the next day when they were at Renteria's house. The prosecution asked about Partida's demeanor, his body language, during the conversation. Chavez answered, "Just like proud or stuff like that, like you know, I guess when you do stuff like that, people feel proud because that's the rival gang member, stuff like that." Defense counsel objected on grounds of responsiveness and speculation, and the trial court overruled the objections. The prosecutor followed up: "So you said proud. Was that like in the way he was talking or

27

like his face, or why did you think so?" Chavez responded, "Yeah, body language."

Even assuming Partida preserved each objection he makes now, permitting the statement was not an abuse of discretion. (*See Sanchez*, *supra*, 63 Cal.4th at p. 456 [abuse of discretion standard governs this evidentiary ruling].)

Under Evidence Code section 800, lay witnesses may express an opinion rationally based on their perception if it is helpful to a clear understanding of their testimony. This may arise when a witness's impression of another's demeanor rests on subtle or complex interactions between them or when it otherwise is impossible to convey the witness's observations adequately. (*Sanchez*, *supra*, 63 Cal.4th at p. 456.) While "[a] lay witness generally may not give an opinion about another person's state of mind," the witness "may testify about objective behavior and describe behavior as being consistent with a state of mind." (*Ibid.*) That is what Chavez did here.

Chavez's description of Partida's demeanor when he recounted the shooting helped the jury understand what Chavez perceived on an important issue during this important meeting. Chavez based his comment on his personal observation. It related to Partida's intent and was relevant. (See *People v. Pearson* (2013) 56 Cal.4th 393, 438 [relevant evidence tends to prove a disputed issue]; see also *id.* at pp. 437–438 [witness's testimony about his interpretation of defendant's nod from the backseat of a police car was relevant to show premeditation and was admissible].)

Chavez could draw on his yearslong friendship with Partida and their yearslong membership in Tepa 13 in making the observation that Partida's demeanor was consistent with

28

pride when he described this recent "work." As the gang expert explained, the more work you put in and the more violent your crime, the more respect and status you earned.

The trial court reasonably could conclude that what happened as Partida described the murder to Chavez was subtle and difficult to put into words and that Chavez merely described behavior consistent with a state of mind. Admitting Chavez's observation fell within the court's discretion. (See *People v. Chatman* (2006) 38 Cal.4th 344, 397 [no abuse of discretion to permit testimony that the defendant seemed to enjoy kicking a custodian, which was relevant at the penalty phase: "Because the witness was a percipient witness, he spoke from personal observation. He was competent to testify that defendant's behavior and demeanor were consistent with enjoyment"]; *People v. Guenther* (2024) 104 Cal.App.5th 483, 529 ["Given the many factors influencing Doe's ongoing participation in and submission to the daily sex acts, we decide it was not error for Doe to state an opinion, based on her perception of Guenther and their patterns of engagement, that it was her perception he was not 'fooled' by her overt acts of submission or expressions of love"].)

H

Partida asserts he received ineffective assistance of counsel to the extent we find his trial counsel forfeited any claim he raises now. We have assumed no forfeiture and therefore need not reach this alternative claim.

I

Partida lastly urges us to reverse based on cumulative error, arguing the combined effect of the errors here denied him due process and a fair trial.

29

As outlined above, we largely have determined there were no errors. Even assuming without deciding it was error to admit Partida's statement to Aranda that he "was there" and to deny examination of the undercover agents, these assumed errors were harmless, whether viewed individually or together. It is not reasonably probable Partida would have attained a more favorable result without them. (See *People v. Poletti* (2015) 240 Cal.App.4th 1191, 1216–1217 [appellate court reverses under the cumulative error doctrine if there is a reasonable possibility the jury would have reached a more favorable result absent a combination of errors].)

Partida received a fair trial.

### III

Turning to Renteria's appeal, Renteria argues his jailhouse confession was coerced and involuntary based on his youth and should have been excluded from his trial. He further claims the trial court failed to consider his youth in determining voluntariness.

We reject both Renteria's claim of coercion and his characterization of the record. On this issue of voluntariness, we independently review the court's legal determinations but review challenged findings of fact for substantial supporting evidence. (*Rodriguez*, *supra*, 40 Cal.App.5th at pp. 197–198.) We ascertain whether the defendant's will was overborne. (*Id.* at p. 199.)

Renteria was 18 when he spoke with the informants. Before trial, he filed a motion to exclude his statements from the *Perkins* operation, which called out his age. The parties argued the motion and stipulated to his age. In its lengthy ruling denying the motion, the trial court correctly considered the totality of the circumstances, including Renteria's age and other

30

"characteristics of the accused[.]" This was proper. (See *Rodriguez*, *supra*, 40 Cal.App.5th at p. 199.) The court explained, among other things, it was apparent Renteria "viewed the cell mate agent as an equal and showed no hint of being intimidated by the atmosphere of the jail." The court concluded Renteria's statements were voluntary.

On appeal, Renteria concedes he "was not legally a juvenile" but maintains placing him in a cell "with a seasoned informant fully informed of the facts of the shooting specifically tasked to, and using techniques designed to, secure admissions of guilt created a coercive atmosphere designed to take advantage of Renteria's youthful inability to reason like an adult and his youthful inexperience with false friends." Renteria notes the informant presented himself as a fellow gang member knowledgeable about Tepa 13 and encouraged Renteria to share with him.

Establishing his own relative youth and lack of experience compared to a knowledgeable informant does not establish coercion (see *Rodriguez*, *supra*, 40 Cal.App.5th at pp. 198–199), and Renteria's confession shows his will was not overborne. (*See id.* at p. 199.)

Renteria struck up conversation with the informants and spoke freely and willingly from the start. He bonded with the main informant about tagging, getting "jumped" into a gang, and other things. The informants referred to Aranda's paperwork and the murder and asked questions after Aranda left, but they did not badger or hound Renteria for details; nor did they intimidate him. Renteria freely shared details about the murder. He asked the main informant for advice and ran an alibi by him. He seemed at ease.

31

Renteria argues youths are susceptible to peer pressure and to greater stress in confinement, which makes them "more susceptible to an informant who seems to throw out a lifeline." He does not attempt to show *he* felt this pressure and stress such that his will was overborne. Instead, he appears to argue for a new rule of coercion for "youthful offenders"—those under 26 years old—while leaning on cases considering cruel and unusual punishment of juveniles under the Eighth Amendment and on other commentary on juveniles. We reject this invitation to break new legal ground.

Renteria may have been young and trusting when he made his jailhouse statements, but he was not coerced. (See *Fayed*, *supra*, 9 Cal.5th at p. 166 [sympathizing, commiserating, coaxing, and prodding by informant not coercion].)

IV

The prosecution correctly maintains the trial court did not impose all mandatory assessments and asks us to correct the judgments to reflect an additional $70 in assessments for each defendant. We do so now.

The joint sentencing hearing took place in February 2023. For each defendant, the trial court ordered a $300 restitution fine, stayed a $300 parole revocation restitution fine, and imposed a single set of assessments based on a single conviction: a $40 court operations assessment under section 1465.8, subdivision (a)(1), and a $30 criminal conviction assessment under Government Code section 70373, subdivision (a)(1).

The prosecution maintains a second set of assessments was required because the defendants suffered two felony convictions each. The prosecution further notes we may correct the assessments on appeal.

Renteria did not respond to the prosecution's argument.

Partida agrees the assessments are mandatory and can be corrected now.  He also concedes there was no forfeiture of this issue.  But he maintains the matter should be remanded because he is entitled to a hearing to determine his ability to pay under *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*).  He acknowledges that there is a body of case law disagreeing with *Dueñas* and that the Supreme Court will address this issue sometime in the future, having granted review in *People v. Kopp* (2019) 38 Cal.App.5th 47 (Nov. 13, 2019, S257844).

No hearing is warranted here.

Partida's and Renteria's sentencing hearing took place four years after *Dueñas*.  At the hearing, neither defendant objected to the hundreds of dollars in fines and assessments the court imposed.  Neither argued an ability to pay hearing was needed, and both waived their right to be present at any future restitution hearing.  Renteria does not address the prosecution's appellate argument about the missing assessments.  Partida's lengthy opening brief omitted any challenge to the original fines and assessments.  His reply brief identifies no reason why he would be unable to earn or pay the extra $70 he admits he owes.  Rather, he concedes his probation report reflects no significant health or emotional problems, implying there is no apparent reason he would be unable to earn this money over his 25-years-to-life prison sentence.  Partida also concedes that, absent some indication of a disability precluding prison work, courts must presume defendants can earn prison wages and that the ability to earn these wages bears on the ability to pay fees.

We infer appellants' ability to pay the additional mandatory assessments from the record and from their

concessions.  Both judgments should reflect these assessments. (See *People v. Aviles* (2019) 39 Cal.App.5th 1055, 1076–1077 [appellate court inferred appellant's ability to pay fines and fees from probable future prison wages, which range from $12 to $56 per month, noting his lengthy prison sentence and the absence of evidence he suffered any permanent disabilities].)

V

Renteria's abstract of judgment does not reflect the reduced firearm enhancement and resulting three-year sentence the trial court imposed.  The abstract must be amended.

**DISPOSITION**

We direct the trial court to prepare an amended abstract of judgment for each appellant reflecting an $80 court operations assessment and a $60 criminal conviction assessment, and to forward certified copies to the Department of Corrections and Rehabilitation.  Renteria's abstract also must be amended to show his three-year firearm enhancement and a total sentence of 28 years to life.  We otherwise affirm both judgments.

WILEY, J.

We concur:

GRIMES, Acting P. J.

VIRAMONTES, J.

34